JS 44 (Rev. 12/07) (cand rev 1-16-08)

# CIVIL COVER SHEET

The JS 44 civil cover sheet and the information contained herein neither replace nor supplement the filing and service of pleadings or other papers as required by law, except as provided by local rules of court. This form, approved by the Judicial Conference of the United States in September 1974, is required for the use of the Clerk of Court for the purpose of initiating the civil docket sheet. (SEE INSTRUCTIONS ON PAGE TWO OF THE FORM.)

## I. (a) PLAINTIFFS

TIMOTHY BROSNAN, an individual;
CARLA BROSNAN, an individual

## DEFENDANTS

DRY CLEANING STATION, INC., a Nebraska corporation;
JOHN A. CAMPBELL, an individual

**(b)** County of Residence of First Listed Plaintiff  San Mateo
(EXCEPT IN U.S. PLAINTIFF CASES)

County of Residence of First Listed Defendant  Hennepin
(IN U.S. PLAINTIFF CASES ONLY)
NOTE: IN LAND CONDEMNATION CASES, USE THE LOCATION OF THE LAND INVOLVED.

**(c)** Attorney's (Firm Name, Address, and Telephone Number)

Michael D. Liberty, Esq.
LAW OFFICE OF MICHAEL D. LIBERTY
1290 Howard Avenue, Suite 303
Burlingame, California 94010        Tel: 650. 685. 8085

Attorneys (If Known)

See, Attachment

## II. BASIS OF JURISDICTION (Place an "X" in One Box Only)

- [ ] 1  U.S. Government Plaintiff
- [ ] 3  Federal Question (U.S. Government Not a Party)
- [X] 2  U.S. Government Defendant
- [X] 4  Diversity (Indicate Citizenship of Parties in Item III)

## III. CITIZENSHIP OF PRINCIPAL PARTIES (Place an "X" in One Box for Plaintiff and One Box for Defendant) (For Diversity Cases Only)

|  | PTF | DEF |  | PTF | DEF |
|---|---|---|---|---|---|
| Citizen of This State | [X] 1 | [ ] 1 | Incorporated or Principal Place of Business In This State | [ ] 4 | [ ] 4 |
| Citizen of Another State | [ ] 2 | [X] 2 | Incorporated and Principal Place of Business In Another State | [ ] 5 | [ ] 5 |
| Citizen or Subject of a Foreign Country | [ ] 3 | [ ] 3 | Foreign Nation | [ ] 6 | [ ] 6 |

## IV. NATURE OF SUIT (Place an "X" in One Box Only)

| CONTRACT | TORTS | | FORFEITURE/PENALTY | BANKRUPTCY | OTHER STATUTES |
|---|---|---|---|---|---|
| | PERSONAL INJURY | PERSONAL INJURY | | | |
| 110 Insurance | 310 Airplane | 362 Personal Injury— | 610 Agriculture | 422 Appeal 28 USC 158 | 400 State Reapportionment |
| 120 Marine | 315 Airplane Product | Med. Malpractice | 620 Other Food & Drug | 423 Withdrawal | 410 Antitrust |
| 130 Miller Act | Liability | 365 Personal Injury — | 625 Drug Related Seizure | 28 USC 157 | 430 Banks and Banking |
| 140 Negotiable Instrument | 320 Assault, Libel & | Product Liability | of Property 21 USC 881 | | 450 Commerce |
| 150 Recovery of Overpayment | Slander | 368 Asbestos Personal | 630 Liquor Laws | **PROPERTY RIGHTS** | 460 Deportation |
| & Enforcement of Judgment | 330 Federal Employers' | Injury Product | 640 R.R. & Truck | 820 Copyrights | 470 Racketeer Influenced and |
| 151 Medicare Act | Liability | Liability | 650 Airline Regs. | 830 Patent | Corrupt Organizations |
| 152 Recovery of Defaulted | 340 Marine | PERSONAL PROPERTY | 660 Occupational | 840 Trademark | 480 Consumer Credit |
| Student Loans | 345 Marine Product | 370 Other Fraud | Safety/Health | | 490 Cable/Sat TV |
| (Excl. Veterans) | Liability | 371 Truth in Lending | 690 Other | | 810 Selective Service |
| 153 Recovery of Overpayment | 350 Motor Vehicle | 380 Other Personal | **LABOR** | **SOCIAL SECURITY** | 850 Securities/Commodities/ |
| of Veteran's Benefits | 355 Motor Vehicle | Property Damage | 710 Fair Labor Standards | 861 HIA (1395ff) | Exchange |
| 160 Stockholders' Suits | Product Liability | 385 Property Damage | Act | 862 Black Lung (923) | 875 Customer Challenge |
| 190 Other Contract | 360 Other Personal Injury | Product Liability | 720 Labor/Mgmt. Relations | 863 DIWC/DIWW (405(g)) | 12 USC 3410 |
| 195 Contract Product Liability | | | 730 Labor/Mgmt. Reporting | 864 SSID Title XVI | 890 Other Statutory Actions |
| 196 Franchise | **CIVIL RIGHTS** | **PRISONER PETITIONS** | & Disclosure Act | 865 RSI (405(g)) | 891 Agricultural Acts |
| **REAL PROPERTY** | 441 Voting | 510 Motions to Vacate | 740 Railway Labor Act | | 892 Economic Stabilization Act |
| 210 Land Condemnation | 442 Employment | Sentence | 790 Other Labor Litigation | **FEDERAL TAX SUITS** | 893 Environmental Matters |
| 220 Foreclosure | 443 Housing/ | **Habeas Corpus:** | 791 Empl. Ret. Inc. Security Act | 870 Taxes (U.S. Plaintiff | 894 Energy Allocation Act |
| 230 Rent Lease & Ejectment | Accommodations | 530 General | | or Defendant) | 895 Freedom of Information Act |
| 240 Torts to Land | 444 Welfare | 535 Death Penalty | **IMMIGRATION** | 871 IRS—Third Party | 900Appeal of Fee |
| 245 Tort Product Liability | 445 Amer. w/Disabilities – | 540 Mandamus & Other | 462 Naturalization Application | 26 USC 7609 | Determination Under Equal Access |
| 290 All Other Real Property | Employment | 550 Civil Rights | 463 Habeas Corpus – | | to Justice |
| | 446 Amer. w/Disabilities – Other | 555 Prison Condition | Alien Detainee | | 950 Constitutionality of State Statutes |
| | 440 Other Civil Rights | | 465 Other Immigration Actions | | |

## V. ORIGIN (Place an "X" in One Box Only)

- [ ] 1 Original Proceeding
- [X] 2 Removed from State Court
- [ ] 3 Remanded from Appellate Court
- [ ] 4 Reinstated or Reopened
- [ ] 5 another district (specify)
- [ ] 6 Multidistrict Litigation
- [ ] 7 Appeal to District Judge from Magistrate Judgment

## VI. CAUSE OF ACTION

Cite the U.S. Civil Statute under which you are filing (Do not cite jurisdictional statutes unless diversity):
28 U.S.C. 1441(b)
Brief description of cause:
Breach of Contract relating to Franchise Agreement

## VII. REQUESTED IN COMPLAINT:

- [ ] CHECK IF THIS IS A CLASS ACTION UNDER F.R.C.P. 23

DEMAND $

CHECK YES only if demanded in complaint:
JURY DEMAND: [ ] Yes [ ] No

## VIII. RELATED CASE(S) IF ANY

PLEASE REFER TO CIVIL L.R. 3-12 CONCERNING REQUIREMENT TO FILE "NOTICE OF RELATED CASE".

## IX. DIVISIONAL ASSIGNMENT (CIVIL L.R. 3-2)

(PLACE AND "X" IN ONE BOX ONLY)

[X] SAN FRANCISCO/OAKLAND   [ ] SAN JOSE

DATE  11 April 2008

SIGNATURE OF ATTORNEY OF RECORD

JS 44 Reverse (Rev. 12/07)

## INSTRUCTIONS FOR ATTORNEYS COMPLETING CIVIL COVER SHEET FORM JS 44

### Authority For Civil Cover Sheet

The JS 44 civil cover sheet and the information contained herein neither replaces nor supplements the filings and service of pleading or other papers as required by law, except as provided by local rules of court. This form, approved by the Judicial Conference of the United States in September 1974, is required for the use of the Clerk of Court for the purpose of initiating the civil docket sheet. Consequently, a civil cover sheet is submitted to the Clerk of Court for each civil complaint filed. The attorney filing a case should complete the form as follows:

**I.** **(a) Plaintiffs-Defendants.** Enter names (last, first, middle initial) of plaintiff and defendant. If the plaintiff or defendant is a government agency, use only the full name or standard abbreviations. If the plaintiff or defendant is an official within a government agency, identify first the agency and then the official, giving both name and title.

(b) County of Residence. For each civil case filed, except U.S. plaintiff cases, enter the name of the county where the first listed plaintiff resides at the time of filing. In U.S. plaintiff cases, enter the name of the county in which the first listed defendant resides at the time of filing. (NOTE: In land condemnation cases, the county of residence of the "defendant" is the location of the tract of land involved.)

(c) Attorneys. Enter the firm name, address, telephone number, and attorney of record. If there are several attorneys, list them on an attachment, noting in this section "(see attachment)".

**II.** **Jurisdiction.** The basis of jurisdiction is set forth under Rule 8(a), F.R.C.P., which requires that jurisdictions be shown in pleadings. Place an "X" in one of the boxes. If there is more than one basis of jurisdiction, precedence is given in the order shown below.

United States plaintiff. (1) Jurisdiction based on 28 U.S.C. 1345 and 1348. Suits by agencies and officers of the United States are included here.

United States defendant. (2) When the plaintiff is suing the United States, its officers or agencies, place an "X" in this box.

Federal question. (3) This refers to suits under 28 U.S.C. 1331, where jurisdiction arises under the Constitution of the United States, an amendment to the Constitution, an act of Congress or a treaty of the United States. In cases where the U.S. is a party, the U.S. plaintiff or defendant code takes precedence, and box 1 or 2 should be marked.

Diversity of citizenship. (4) This refers to suits under 28 U.S.C. 1332, where parties are citizens of different states. When Box 4 is checked, the citizenship of the different parties must be checked. (See Section III below; federal question actions take precedence over diversity cases.)

**III.** **Residence (citizenship) of Principal Parties.** This section of the JS 44 is to be completed if diversity of citizenship was indicated above. Mark this section for each principal party.

**IV.** **Nature of Suit.** Place an "X" in the appropriate box. If the nature of suit cannot be determined, be sure the cause of action, in Section VI below, is sufficient to enable the deputy clerk or the statistical clerks in the Administrative Office to determine the nature of suit. If the cause fits more than one nature of suit, select the most definitive.

**V.** **Origin.** Place an "X" in one of the seven boxes.

Original Proceedings. (1) Cases which originate in the United States district courts.

Removed from State Court. (2) Proceedings initiated in state courts may be removed to the district courts under Title 28 U.S.C., Section 1441. When the petition for removal is granted, check this box.

Remanded from Appellate Court. (3) Check this box for cases remanded to the district court for further action. Use the date of remand as the filing date.

Reinstated or Reopened. (4) Check this box for cases reinstated or reopened in the district court. Use the reopening date as the filing date.

Transferred from Another District. (5) For cases transferred under Title 28 U.S.C. Section 1404(a). Do not use this for within district transfers or multidistrict litigation transfers.

Multidistrict Litigation. (6) Check this box when a multidistrict case is transferred into the district under authority of Title 28 U.S.C. Section 1407. When this box is checked, do not check (5) above.

Appeal to District Judge from Magistrate Judgment. (7) Check this box for an appeal from a magistrate judge's decision.

**VI.** **Cause of Action.** Report the civil statute directly related to the cause of action and give a brief description of the cause. **Do not cite jurisdictional statutes unless diversity.**        Example:        U.S. Civil Statute: 47 USC 553
                                                                                   Brief Description: Unauthorized reception of cable service

**VII.** **Requested in Complaint.** Class Action. Place an "X" in this box if you are filing a class action under Rule 23, F.R.Cv.P.

Demand. In this space enter the dollar amount (in thousands of dollars) being demanded or indicate other demand such as a preliminary injunction.

Jury Demand. Check the appropriate box to indicate whether or not a jury is being demanded.

**VIII.** **Related Cases.** This section of the JS 44 is used to reference related pending cases if any. If there are related pending cases, insert the docket numbers and the corresponding judge names for such cases.

**Date and Attorney Signature.** Date and sign the civil cover sheet.

## ATTACHMENT TO CIVIL COVER SHEET

Wolfgang F. Hahn, Esq.   [SBN # 061385]
WOLFGANG F. HAHN & ASSOCIATES
7160 Caminito Pepino
La Jolla, California  92037
Telephone      :    858. 535. 1000
Telecopier     :    858. 456. 5080
E-Mail Address:    ellobo1@san.rr.com

Attorneys for  Defendants
DRY CLEANING STATION, INC. and JOHN A. CAMPBELL

James M. Susag, Esq.
Cheryl M. Klaus, Esq.
LARKIN HOFFMAN DALY & LINDGREN, LTD.
1500 Wells Fargo Plaza
7900 Xerxes Avenue South
Minneapolis, Minnesota 55413-1194
Telephone      :    952. 835. 3800
Telecopier     :    952. 896. 3333
E-Mail Address:    www.larkinhoffman.com

Attorneys for  Defendants
DRY CLEANING STATION, INC. and JOHN A. CAMPBELL

1   Wolfgang F. Hahn, Esq.   [SBN # 061385]
    WOLFGANG F. HAHN & ASSOCIATES
2   7160 Caminito Pepino
3   La Jolla, California 92037
    Telephone : 858. 535. 1000
4   Telecopier : 858. 456. 5080
    E-Mail    : ellobo1@san.rr.com
5

6   Attorneys for Defendants
    DRY CLEANING STATION, INC. and JOHN A. CAMPBELL
7
    James M. Susag, Esq.
8   Cynthia M. Klaus, Esq.
    LARKIN HOFFMAN DALY & LINDGREN, LTD.
9   1500 Wells Fargo Plaza
    7900 Xerxes Avenue South
10  Minneapolis, Minnesota 55431-1194
    Telephone : 952. 835. 3800
11  Telecopier : 952. 896. 3333
12  E-Mail    : www.larkinbhoffman.com

13  Attorneys for Defendants
    DRY CLEANING STATION, INC. and JOHN A. CAMPBELL
14

                        **UNITED STATES DISTRICT COURT**
15

                        **NORTHERN DISTRICT OF CALIFORNIA**
16

17  TIMOTHY BROSNAN, an individual;          Case No. _____ _____
    CARLA BROSNAN, an individual;
18
                                            **08                    2028**
19                          Plaintiff,       **DEFENDANTS DRY CLEANING STATION,
                                            INC. AND JOHN A. CAMPBELL'S NOTICE**
20  vs.                                     **OF REMOVAL OF STATE COURT ACTION
                                            UNDER 28 U.S.C. § 1441(b) (DIVERSITY)**
21

22  DRY CLEANING STATION, INC.,
    a corporation; JOHN A. CAMPBELL, an
23  individual; does 1 Through 50, Inclusive

24
                            Defendants.
25

26                            DEFENDANTS DRY CLEANING STATION, INC., AND JOHN A CAMPBELL'S
                                            NOTICE OF REMOVAL OF STATE COURT ACTION
                                                                        PAGE  1
27  TIMOTHY BROSNAN/CARLA BROSNAN vs. DRY CLEANING STATION, INC., ET AL.

28

FILED

APR 18 2008

RICHARD W. WIEKING
CLERK, U.S. DISTRICT COURT
NORTHERN DISTRICT OF CALIFORNIA

E-filing

EDL

**TO:    CLERK OF THE ABOVE-ENTITLED COURT:**

**PLEASE TAKE NOTICE THAT** defendants DRY CLEANING STATION, INC. , a Nebraska corporation, with its principal of business in Minneapolis, Minnesota and JOHN A CAMPBELL, a Minnesota resident, hereby remove to this Court the state court action described below:

1.    On 17 March 2008, an action was commenced in the Superior Court of the State of California in and for the County of San Mateo entitled Timothy Brosnan and Carla Brosnan , Plaintiffs v. Dry Cleaning Station, Inc., John A. Campbell, Et Al., Defendants, as Case Number CIV 471 208. A copy of the Summons and Complaint of the action ("State Court Action") is marked Exhibit A, attached hereto and by this reference is incorporated herein.

2.    The first date upon which defendants received a copy of said Summons and Complaint was 21 March 2008, when defendant DRY CLEANING STATION, INC. was served with a copy of said Summons and Complaint from said State Court Action.

3.    **Jurisdiction.**  This action is a civil action of which this Court has original jurisdiction under 28 U.S.C. § 1332 and is one which may be removed to this Court by defendants pursuant to the provisions of  28 U.S.C. § 1441(b) in that it is a civil action between citizens of different states and the matter in controversy exceeds the sum of Seventy-Five Thousand Dollars ($75,000.00), exclusive of interest and costs, because (a) defendant DRY CLEANING STATION, INC. is a Nebraska corporation, with its principal of business in Minneapolis, Minnesota; and (b) defendant JOHN A CAMPBELL is a resident of the State of Minnesota.

1    4.    Defendants are informed and believe that both plaintiffs Timothy Brosnan and

2    Carla Brosnan were, at all times relevant hereto, and remain citizens of the State of California

3    and were such at the time of the filing of the State Court Action.

4                                      WOLFGANG F. HAHN & ASSOCIATES

5

6

7    Dated: 15 April 2008                By:

8                                           WOLFGANG F. HAHN
                                            Attorney for Defendants
9                                           DRY CLEANING STATION, INC.
                                            and JOHN A CAMPBELL

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25                      DEFENDANT DRY CLEANING STATION, INC., AND JOHN A CAMPBELL'S
                                   NOTICE OF REMOVAL OF STATE COURT ACTION
                                                                          PAGE 3
26    TIMOTHY BROSNAN/CARLA BROSNAN vs. DRY CLEANING STATION, INC., ET AL.

27

28

EXHIBIT A

CM-010

| ATTORNEY OR PARTY WITHOUT ATTORNEY (Name, State Bar number, and address): | FOR COURT USE ONLY |
|---|---|
| Michael D. Liberty (136088)<br>LAW OFFICE OF MICHAEL D. LIBERTY<br>1290 Howard Avenue, Suite 303<br>Burlingame, CA 94010 | |

TELEPHONE NO.: (650) 685-8085    FAX NO.: (650) 685-8086
ATTORNEY FOR (Name): Timothy Brosnan and Carla Brosnan

SUPERIOR COURT OF CALIFORNIA, COUNTY OF San Mateo
STREET ADDRESS: 400 County Center
MAILING ADDRESS:
CITY AND ZIP CODE: Redwood City, CA 94063
BRANCH NAME: Southern

CASE NAME:

**RECEIVED**

MAR 17 2008

CLERK OF THE SUPERIOR COURT
SAN MATEO COUNTY

| CIVIL CASE COVER SHEET | Complex Case Designation | CASE NUMBER: |
|---|---|---|
| [X] Unlimited   [ ] Limited<br>(Amount         (Amount<br>demanded       demanded is<br>exceeds $25,000)  $25,000 or less) | [ ] Counter   [ ] Joinder<br>Filed with first appearance by defendant<br>(Cal. Rules of Court, rule 3.402) | CIV 471208<br>JUDGE:<br>DEPT: |

*Items 1-6 below must be completed (see instructions on page 2).*

1. Check **one** box below for the case type that best describes this case:

**Auto Tort**
[ ] Auto (22)
[ ] Uninsured motorist (46)
**Other PI/PD/WD (Personal Injury/Property Damage/Wrongful Death) Tort**
[ ] Asbestos (04)
[ ] Product liability (24)
[ ] Medical malpractice (45)
[ ] Other PI/PD/WD (23)
**Non-PI/PD/WD (Other) Tort**
[ ] Business tort/unfair business practice (07)
[ ] Civil rights (08)
[ ] Defamation (13)
[X] Fraud (16)
[ ] Intellectual property (19)
[ ] Professional negligence (25)
[ ] Other non-PI/PD/WD tort (35)
**Employment**
[ ] Wrongful termination (36)
[ ] Other employment (15)

**Contract**
[ ] Breach of contract/warranty (06)
[ ] Rule 3.740 collections (09)
[ ] Other collections (09)
[ ] Insurance coverage (18)
[ ] Other contract (37)
**Real Property**
[ ] Eminent domain/Inverse condemnation (14)
[ ] Wrongful eviction (33)
[ ] Other real property (26)
**Unlawful Detainer**
[ ] Commercial (31)
[ ] Residential (32)
[ ] Drugs (38)
**Judicial Review**
[ ] Asset forfeiture (05)
[ ] Petition re: arbitration award (11)
[ ] Writ of mandate (02)
[ ] Other judicial review (39)

**Provisionally Complex Civil Litigation**
**(Cal. Rules of Court, rules 3.400-3.403)**
[ ] Antitrust/Trade regulation (03)
[ ] Construction defect (10)
[ ] Mass tort (40)
[ ] Securities litigation (28)
[ ] Environmental/Toxic tort (30)
[ ] Insurance coverage claims arising from the above listed provisionally complex case types (41)
**Enforcement of Judgment**
[ ] Enforcement of judgment (20)
**Miscellaneous Civil Complaint**
[ ] RICO (27)
[ ] Other complaint (not specified above) (42)
**Miscellaneous Civil Petition**
[ ] Partnership and corporate governance (21)
[ ] Other petition (not specified above) (43)

2. This case [ ] is  [X] is not  complex under rule 3.400 of the California Rules of Court. If the case is complex, mark the factors requiring exceptional judicial management:
   a. [ ] Large number of separately represented parties    d. [ ] Large number of witnesses
   b. [ ] Extensive motion practice raising difficult or novel    e. [ ] Coordination with related actions pending in one or more courts
      issues that will be time-consuming to resolve         in other counties, states, or countries, or in a federal court
   c. [ ] Substantial amount of documentary evidence    f. [ ] Substantial postjudgment judicial supervision
3. Remedies sought (check all that apply): a. [X] monetary  b. [X] nonmonetary; declaratory or injunctive relief  c. [X] punitive
4. Number of causes of action (specify): Eight
5. This case [ ] is  [X] is not  a class action suit.
6. If there are any known related cases, file and serve a notice of related case. (You may use form CM-015.)
Date: March 13, 2008
Michael D. Liberty (136088)
_____          ▶ _____
(TYPE OR PRINT NAME)                         (SIGNATURE OF PARTY OR ATTORNEY FOR PARTY)

**NOTICE**
- Plaintiff must file this cover sheet with the first paper filed in the action or proceeding (except small claims cases or cases filed under the Probate Code, Family Code, or Welfare and Institutions Code). (Cal. Rules of Court, rule 3.220.) Failure to file may result in sanctions.
- File this cover sheet in addition to any cover sheet required by local court rule.
- If this case is complex under rule 3.400 et seq. of the California Rules of Court, you must serve a copy of this cover sheet on all other parties to the action or proceeding.
- Unless this is a collections case under rule 3.740 or a complex case, this cover sheet will be used for statistical purposes only.

Page 1 of 2

Form Adopted for Mandatory Use
Judicial Council of California
CM-010 [Rev. July 1, 2007]

**CIVIL CASE COVER SHEET**

Legal
Solutions
Plus

Cal. Rules of Court, rules 2.30, 3.220, 3.400-3.403, 3.740;
Cal. Standards of Judicial Administration, std. 3.10

**To Plaintiffs and Others Filing First Papers.** If you are filing a first paper (for example, a complaint) in a civil case, you **must** complete and file, along with your first paper, the *Civil Case Cover Sheet* contained on page 1. This information will be used to compile statistics about the types and numbers of cases filed. You must complete items 1 through 6 on the sheet. In item 1, you must check **one** box for the case type that best describes the case. If the case fits both a general and a more specific type of case listed in item 1, check the more specific one. If the case has multiple causes of action, check the box that best indicates the **primary** cause of action. To assist you in completing the sheet, examples of the cases that belong under each case type in item 1 are provided below. A cover sheet must be filed only with your initial paper. Failure to file a cover sheet with the first paper filed in a civil case may subject a party, its counsel, or both to sanctions under rules 2.30 and 3.220 of the California Rules of Court.

**To Parties in Rule 3.740 Collections Cases.** A "collections case" under rule 3.740 is defined as an action for recovery of money owed in a sum stated to be certain that is not more than $25,000, exclusive of interest and attorney's fees, arising from a transaction in which property, services, or money was acquired on credit. A collections case does not include an action seeking the following: (1) tort damages, (2) punitive damages, (3) recovery of real property, (4) recovery of personal property, or (5) a prejudgment writ of attachment. The identification of a case as a rule 3.740 collections case on this form means that it will be exempt from the general time-for-service requirements and case management rules, unless a defendant files a responsive pleading. A rule 3.740 collections case will be subject to the requirements for service and obtaining a judgment in rule 3.740.

**To Parties in Complex Cases.** In complex cases only, parties must also use the *Civil Case Cover Sheet* to designate whether the case is complex. If a plaintiff believes the case is complex under rule 3.400 of the California Rules of Court, this must be indicated by completing the appropriate boxes in items 1 and 2. If a plaintiff designates a case as complex, the cover sheet must be served with the complaint on all parties to the action. A defendant may file and serve no later than the time of its first appearance a joinder in the plaintiff's designation, a counter-designation that the case is not complex, or, if the plaintiff has made no designation, a designation that the case is complex.

## CASE TYPES AND EXAMPLES

**Auto Tort**
Auto (22)—Personal Injury/Property Damage/Wrongful Death
Uninsured Motorist (46) *(if the case involves an uninsured motorist claim subject to arbitration, check this item instead of Auto)*

**Other PI/PD/WD (Personal Injury/ Property Damage/Wrongful Death) Tort**
Asbestos (04)
  Asbestos Property Damage
  Asbestos Personal Injury/ Wrongful Death
Product Liability *(not asbestos or toxic/environmental)* (24)
Medical Malpractice (45)
  Medical Malpractice–
    Physicians & Surgeons
  Other Professional Health Care Malpractice
Other PI/PD/WD (23)
  Premises Liability (e.g., slip and fall)
  Intentional Bodily Injury/PD/WD (e.g., assault, vandalism)
  Intentional Infliction of Emotional Distress
  Negligent Infliction of Emotional Distress
  Other PI/PD/WD

**Non-PI/PD/WD (Other) Tort**
Business Tort/Unfair Business Practice (07)
Civil Rights (e.g., discrimination, false arrest) *(not civil harassment)* (08)
Defamation (e.g., slander, libel) (13)
Fraud (16)
Intellectual Property (19)
Professional Negligence (25)
  Legal Malpractice
  Other Professional Malpractice *(not medical or legal)*
Other Non-PI/PD/WD Tort (35)

**Employment**
Wrongful Termination (36)
Other Employment (15)

**Contract**
Breach of Contract/Warranty (06)
  Breach of Rental/Lease Contract *(not unlawful detainer or wrongful eviction)*
  Contract/Warranty Breach—Seller Plaintiff *(not fraud or negligence)*
  Negligent Breach of Contract/ Warranty
  Other Breach of Contract/Warranty
Collections (e.g., money owed, open book accounts) (09)
  Collection Case—Seller Plaintiff
  Other Promissory Note/Collections Case
Insurance Coverage *(not provisionally complex)* (18)
  Auto Subrogation
  Other Coverage
Other Contract (37)
  Contractual Fraud
  Other Contract Dispute

**Real Property**
Eminent Domain/Inverse Condemnation (14)
Wrongful Eviction (33)
Other Real Property (e.g., quiet title) (26)
  Writ of Possession of Real Property
  Mortgage Foreclosure
  Quiet Title
  Other Real Property *(not eminent domain, landlord/tenant, or foreclosure)*

**Unlawful Detainer**
Commercial (31)
Residential (32)
Drugs (38) *(if the case involves illegal drugs, check this item; otherwise, report as Commercial or Residential)*

**Judicial Review**
Asset Forfeiture (05)
Petition Re: Arbitration Award (11)
Writ of Mandate (02)
  Writ–Administrative Mandamus
  Writ–Mandamus on Limited Court Case Matter
  Writ–Other Limited Court Case Review
Other Judicial Review (39)
  Review of Health Officer Order
  Notice of Appeal–Labor Commissioner Appeals

**Provisionally Complex Civil Litigation (Cal. Rules of Court Rules 3.400–3.403)**
Antitrust/Trade Regulation (03)
Construction Defect (10)
Claims Involving Mass Tort (40)
Securities Litigation (28)
Environmental/Toxic Tort (30)
Insurance Coverage Claims *(arising from provisionally complex case type listed above)* (41)

**Enforcement of Judgment**
Enforcement of Judgment (20)
  Abstract of Judgment (Out of County)
  Confession of Judgment *(non-domestic relations)*
  Sister State Judgment
  Administrative Agency Award *(not unpaid taxes)*
  Petition/Certification of Entry of Judgment on Unpaid Taxes
  Other Enforcement of Judgment Case

**Miscellaneous Civil Complaint**
RICO (27)
Other Complaint *(not specified above)* (42)
  Declaratory Relief Only
  Injunctive Relief Only *(non-harassment)*
  Mechanics Lien
  Other Commercial Complaint Case *(non-tort/non-complex)*
  Other Civil Complaint *(non-tort/non-complex)*

**Miscellaneous Civil Petition**
Partnership and Corporate Governance (21)
Other Petition *(not specified above)* (43)
  Civil Harassment
  Workplace Violence
  Elder/Dependent Adult Abuse
  Election Contest
  Petition for Name Change
  Petition for Relief from Late Claim
  Other Civil Petition

1 | LAW OFFICE OF MICHAEL D. LIBERTY
Michael D. Liberty, Esq. (Bar No. 136088)
2 | Assaad Stephan (Bar No. 246183)
1290 Howard Avenue, Suite 303
3 | Burlingame, California 94010
Telephone: (650) 685-8085
4 | Facsimile: (650) 685-8086
mdlaw@pacbell.net
5 |
Attorney for Plaintiffs
6 | TIMOTHY BROSNAN and
CARLA BROSNAN
7 |

ENDORSED FILED
SAN MATEO COUNTY

MAR 1 7 2008

Clerk of the Superior Court
By ____ G. Jackson
DEPUTY CLERK

8

SUPERIOR COURT OF CALIFORNIA: UNLIMITED

9

COUNTY OF SAN MATEO

10

11

12 | TIMOTHY BROSNAN, an
individual;          ) No.
13 | CARLA BROSNAN, an individual, )

**CIV 471208**

14 |          Plaintiffs,

          ) COMPLAINT FOR DAMAGES

15 |     vs.

16 | DRY CLEANING STATION, INC., a
Corporation;
17 | JOHN A. CAMPBELL, an
individual;
18 | and DOES 1 through 50,
inclusive,

19 |          Defendants.

20

Plaintiffs TIMOTHY BROSNAN and CARLA BROSNAN (collectively the

21

Brosnans'') allege as follows:

22

**GENERAL ALLEGATIONS**

23

**PARTIES**

24

1. Plaintiff TIMOTHY BROSNAN is an individual residing in San Mateo

25

County, California.

26

2. Plaintiff CARLA BROSNAN is an individual residing in San Mateo

27

County, California.

28

*Law Office Of Michael D. Liberty*
*1290 Howard Ave., Suite 303*
*Burlingame, CA 94010*
*650.685.8085*

COMPLAINT FOR DAMAGES
1

1  3. Defendant DRY CLEANING STATION, INC. (''DRY CLEANING STATION,
2  INC.'') is a corporation, headquartered in the state of Minnesota.
3  The Corporation owns and operates a franchise known as Dry Cleaning
4  Station, a dry cleaning operation doing business throughout the
5  United States.

6  4. Defendant JOHN A. CAMPBELL (''CAMPBELL'') is an individual and is
7  responsible for the misrepresentations and concealments of material
8  facts as hereinafter alleged, because he, at all material times, was
9  a Chairman and CEO of DRY CLEANING STATION, INC. and directly or
10  indirectly controlled persons liable to plaintiffs, occupied a
11  similar status or performed similar functions as liable persons
12  pursuant to California Corporations Code section 31302 and/or
13  materially aided in the act or transaction constituting the
14  violation. CAMPBELL is personally liable and jointly and severally
15  liable in this action under California Corporations Code sections
16  31300 et seq.

17  5. Defendants are guilty of oppression, fraud, and/or malice, and
18  plaintiffs, in addition to their actual damages, may recover
19  exemplary damages for the sake of example and by way of punishing the
20  defendants.

21  6. Dry Cleaning Station, Inc. was the employer of Campbell and is
22  liable for punitive damages based upon Campbell's acts as its
23  employee because Dry Cleaning Station, Inc. had advance knowledge of
24  the unfitness of Campbell and employed him with a conscious disregard
25  of the rights or safety of others - including plaintiffs - and/or
26  authorized or ratified Campbell's wrongful conduct for which damages
27  will be awarded and/or was personally guilty of oppression, fraud, or
28  malice. Campbell was an officer, director, or managing agent of Dry

1  Cleaning Station, Inc.

2  <center>**DOE DEFENDANTS AND AGENCY**</center>

3  7. The true names and capacities, whether corporate, individual,
4  partnership or otherwise of defendants named in this complaint as
5  Does 1 through 50 are unknown to Plaintiffs and for that reason
6  Plaintiffs sue them by the fictitious names. Plaintiffs are informed
7  and believe and thereon allege that each of the Doe defendants is
8  legally or otherwise responsible in some manner for the actions
9  alleged in this complaint and Plaintiffs' damages were proximately
10 caused by the Doe defendant' acts.  Plaintiffs allege that each of
11 the defendants, including the Doe defendants, is jointly and
12 severally liable as principal, agent, employer, partner or alter-ego
13 of each of the remaining defendants and was, in performing the acts
14 complained of in this complaint, acting at least partially within the
15 scope of that agency, employment, partnership or alter-ego authority.

16 <center>**CONSPIRACY AND AIDING AND ABETTING ALLEGATIONS**</center>
17 7. Each of the defendants aided in the wrongful conduct set forth in
18 this complaint.  In taking the action to aid the conduct, each
19 defendant acted with an awareness of the primary wrongdoing and
20 realized that his conduct would substantially assist the
21 accomplishment of the conduct and was aware of his overall
22 contribution to, and furtherance of, the conspiracy.  Defendants'
23 acts did include all of the acts each of them is alleged to have
24 committed in furtherance of the conspiracy except those relating to
25 the reaching of the agreements sufficient to categorize their conduct
26 as conspiratorial.

27 8. The defendants aided in the unlawful conduct set forth in this
28 Complaint in order to wrongfully induce plaintiffs into entering into

<center>COMPLAINT FOR DAMAGES</center>
<center>3</center>

a.w Office Of Michael D. Liberty<br>1290 Howard Ave., Suite 303<br>Burlingame, CA 94010<br>650.685.8085

1  and continuing performance of the contracts, a Franchise Agreement,
2  attached hereto as Exhibit A, and a Territorial Development
3  Agreement, attached hereto as Exhibit B, as well as the franchise
4  relationship. The Franchise Agreement and the Territorial Development
5  Agreement are incorporated by reference into this complaint as though
6  fully set out herein.

## JURISDICTION AND VENUE

8  9. Jurisdiction and venue are appropriate in Superior Court of San
9  Mateo County because Plaintiffs performed their part of the bargain
10  here, the subject franchise is located here, and Plaintiffs reside
11  here. Venue in this county is proper pursuant to Corporations Code
12  section 31302.5 as the subject franchise does business here. Any
13  attempt by Dry Cleaning Station, Inc. to enforce an out of state
14  venue provision is void.

## FACTUAL ALLEGATIONS

16  10.  Prior to entering to the contracts attached as Exhibits A and B,
17  Mr. and Mrs. Brosnan met defendant CAMPBELL in San Diego.
18  11.  During that San Diego meeting, CAMPBELL orally misrepresented
19  many material facts about DRY CLEANING STATION, INC. to the Brosnans,
20  as prospective franchisees.

21  12.  Based upon these misrepresentations, the Brosnans entered into a
22  Franchise Agreement and Territorial Development Agreement with
23  defendants DRY CLEANING STATION, INC. and CAMPBELL.  The Brosnans
24  became responsible for the territories in the counties of Alameda,
25  Santa Clara, San Mateo, Sacramento, Yolo, and Orange County.
26  13.  In order to induce the Brosnans into entering and signing the
27  Franchise Agreement and Territorial Development Agreement, CAMPBELL
28  made the following representations to the Brosnans:

COMPLAINT FOR DAMAGES
4

Law Office Of Michael D. Liberty
1290 Howard Ave, Suite 303
Burlingame, CA 94010
650-685-008X

1    a.   That it would only take three to six months for a

2         prospective franchisee's "drop store" business to become

3         profitable;

4    b.   That it would only take $5,000 - $10,000 in working capital

5         in order for a "drop store" to start up;

6    c.   That the average "drop store" brought in gross revenues

7         of approximately $300,000 after one year;

8    d.   That DRY CLEANING STATION, INC.'s San Diego territory was a

9         glowing model for any franchisee developer to follow and

10        that the San Diego territorial master developer had

11        recently signed up eight "drop stores" within a two month

12        period;

13   e.   That the Brosnans would make between $300,000 to $350,000

14        per year for being master franchise area developers.

15   14.  Each of these representations was false, incomplete and/or

16   misleading.  Based upon these misrepresentations, the Brosnans entered

17   into and signed the Franchise Agreement and Territorial Development

18   Agreement.

19   15.  After the Brosnans entered into and signed the Franchise

20   Agreement and Territorial Development Agreement, they found out

21   CAMPBELL had misrepresented material facts to them.

22   16.  The true facts were the following:

23   a.   That it took a prospective franchisee between twelve to

24        twenty-four months or longer to make a profitable business;

25   b.   That franchisees needed almost $100,000 in additional

26        working capital in order to get a DRY CLEANING STATION, INC.

27        franchise store "up and running".

28   c.   That an average DRY CLEANING STATION, INC. franchise

Law Office Of Michael D. Liberty
1290 Howard Ave., Suite 303
Burlingame, CA 94010
650.685.8085

1          business only made approximately $170,000 or less in revenue

2          during its first year of business.

3      d.   That DRY CLEANING STATION, INC. and its area developer for

4          the San Diego territory used unsound business practices to

5          sign up the eight ''drop stores'' within the two months

6          period, and that it was not a ''glowing model'' for the

7          Brosnans to rely upon.

8   17.  When CAMPBELL made these unsubstantiated and false claims for

9   future earnings of a franchise, CAMPBELL violated Federal Trade

10  Commission's rules outlined in 16 CFR 436.1 et seq.

11  18.  Had the Brosnans known that DRY CLEANING STATION, INC. over-

12  extended and improperly serviced franchise drop stores in its

13  ''model'' San Diego territory, the Brosnans would not have entered

14  into the Franchise Agreement or the Territorial Development

15  Agreement.

16  19.  Defendants DRY CLEANING STATION, INC. and CAMPBELL breached their

17  duty to the Brosnans by failing to communicate and relay information

18  to the Brosnans regarding potential franchisees in the Brosnans'

19  assigned territories.

20  20.  Pursuant to the schedule set forth on page 4 of the Territorial

21  Development Agreement, the Brosnans were expected to open a certain

22  number of DRY CLEANING STATION, INC. stores in their territory every

23  year for ten years.

24  21.  It was impossible for the Brosnans to meet this schedule because

25  defendants DRY CLEANING STATION, INC. and CAMPBELL failed to inform

26  the Brosnans, as area developers, of details of Dry Cleaning Station,

27  Inc.'s contacts with potential franchisees who would work under the

28  Brosnans.

Law Office Of Michael D. Liberty
1290 Howard Ave, Suite 303
Burlingame, CA  94010
650.685.8085

1   22.  DRY CLEANING STATION, INC. and CAMPBELL concealed the fact that
2   the National Sales Manager for DRY CLEANING STATION, INC., Jay
3   Campbell, was leaving the company.

4   23.  It was impossible for the Brosnans to meet their schedule because
5   DRY CLEANING STATION, INC. and CAMPBELL failed to honor his promise
6   to assist the Brosnans by working with them in obtaining new
7   franchisees, and because DRY CLEANING STATION, INC. and CAMPBELL
8   excluded the Brosnans from communications with prospective franchisees
9   in their assigned territories.

10  24.  CAMPBELL also told the Brosnans that they would have to pay a
11  $5,000 transfer fee to purchase the Orange County territory, which
12  they did.  This was false, as the transferor was responsible for
13  paying that fee.

14  25.  In reliance on the above misrepresentations and concealments,
15  the Brosnans paid approximately $360,000 to defendants to fund the
16  failed franchise arrangement and to purchase the Orange County
17  territory.  The Brosnans also incurred approximately $135,000 in
18  costs to start up their franchises.

19  26.  Recently, defendants allowed a franchisee to open a franchise in
20  Union City, California without the Brosnans knowledge, consent or
21  remuneration.

22                       **FIRST CAUSE OF ACTION**

23  **(FRAUD, INCLUDING CONCEALMENT AGAINST JOHN A. CAMPBELL AND DRY**

24          **CLEANING STATION, INC. AND DOES 1 THROUGH 20)**

25  27.  Plaintiffs reallege as though set forth fully herein paragraphs
26  1 through 26.

27  28.  Defendants CAMPBELL and DRY CLEANING STATION, INC. and/or Does 1
28  through 20, inclusive, made the above false representations to the

COMPLAINT FOR DAMAGES
7

Law Office Of Michael D. Liberty
1290 Howard Ave., Suite 303
Burlingame, CA 94010
650-685-0085

1   Brosnans. CAMPBELL and defendants knew these representations were

2   false when they were made.   The true facts were:

3       a. That it took a prospective franchisee between twelve to

4          twenty-four months or longer to make a profitable business;

5       b. That franchisees needed almost $100,000 in additional working

6          capital in order to get a DRY CLEANING STATION, INC. franchise

7          store ''up and running''.

8       c. That an average DRY CLEANING STATION, INC. franchise business

9          only made approximately $170,000 or less in revenue during

10         its first year of business.

11      d. That DRY CLEANING STATION, INC. and its area developer for

12         the San Diego territory used unsound business practices to

13         sign up the eight ''drop stores'' within the two months

14         period.

15  29.   Defendants' misrepresentations were made with the intent to

16  induce the Brosnans into entering and signing the Franchise Agreement

17  and Territorial Development Agreement, which they did.

18  30.   Defendant CAMPBELL is an individual and is responsible for the

19  misrepresentations and concealments of material facts as hereinafter

20  alleged, because he, at all material times, was the Chairman and CEO

21  of DRY CLEANING STATION, INC. and directly or indirectly controlled

22  persons liable to Plaintiffs, occupied a similar status or performed

23  similar functions as liable persons pursuant to California

24  Corporations Code section 31302 and/or materially aided in the act or

25  transaction constituting the violation. CAMPBELL is personally liable

26  and jointly and severally liable in this action under California

27  Corporations Code sections 31300 et seq.

28  31.   Plaintiffs were ignorant of the falsity of these representations

Law Office Of Michael D. Liberty
1290 Howard Ave., Suite 303
Burlingame, CA 94010
650-685-5085

1   and reasonably believed them to be true.  In justifiable reliance on
2   these representations, Plaintiffs entered into the Franchise
3   Agreement and Territorial Development Agreement with defendants.
4   32.  Had the Brosnans known the true facts, they would not have
5   entered into the Franchise Agreement or the Territorial Development
6   Agreement with defendants.

7   33.  Defendants CAMPBELL and DRY CLEANING STATION, INC. were under a
8   duty to disclose these material facts to Plaintiffs because they were
9   exclusively in possession of material inside information which they
10  knew Plaintiffs did not possess and to which defendants knew
11  Plaintiffs did not have access.

12  34.  Defendants also only gave Plaintiffs partial and half-truths,
13  imposing a duty of full disclosure on defendants.

14  35.  Had Plaintiffs known the true facts, they would not have entered
15  into - nor continued with -- the Franchise Agreement or Territorial
16  Development Agreement with defendants.

17  36.  As a proximate result of defendants' fraud, Plaintiffs have been
18  damaged in an amount excess of the jurisdictional minimum of this
19  court which will be proven at trial.

20  37.  In performing the acts set forth above, defendants acted with
21  oppression, fraud and/or malice entitling Plaintiffs to exemplary
22  damages in an amount which will be proven at trial.

23  WHEREFORE, the Brosnans pray for judgment as set forth below.

24                          **SECOND CAUSE OF ACTION**

25      **(NEGLIGENT MISREPRESENTATION AGAINST JOHN A. CAMPBELL AND DRY**

26          **CLEANING STATION, INC. AND DOES 1 THROUGH 20)**

27  38.  Plaintiffs allege as though set forth fully herein paragraphs 1
28  through 37, except the second sentence of paragraph 28.

COMPLAINT FOR DAMAGES
9

Law Office Of Michael D. Liberty
1290 Howard Ave., Suite 303
Burlingame, CA  94010
650.685.8085

1   39.   Defendants and/or Does 1 through 20, inclusive, should have

2   known that their representations were false. These misrepresentations

3   were made by defendant CAMPBELL and DRY CLEANING STATION, INC., who

4   had no reasonable grounds for believing them to be true. Defendants

5   had a duty to tell Plaintiffs the truth and not conceal material

6   facts.

7   40.  Had Plaintiffs known the true facts, Plaintiffs would not have

8   entered into the Franchise Agreement or the Territorial Development

9   Agreement with defendants nor continued with the franchise

10   arrangement.

11   41.   As a proximate result of defendants' negligent

12   misrepresentations, Plaintiffs have been damaged in excess of the

13   jurisdictional minimum of this court, which will be proven at trial.

14   WHEREFORE, the Brosnans pray for judgment as set forth below.

15   **THIRD CAUSE OF ACTION**

16   **(BREACH OF WRITTEN CONTRACT OF FRANCHISE AGREEMENT AGAINST DRY**

17   **CLEANING STATION, INC.)**

18   42.   Plaintiffs allege as though set forth fully herein paragraphs 1

19   through 41.

20   43.   On August 8, 2005, plaintiffs and DRY CLEANING STATION, INC.

21   entered into a Franchise Agreement, attached as Exhibit A.

22   44.   Plaintiffs performed all conditions and covenants required by

23   them pursuant to the terms of the Franchise Agreement.

24   45.   Defendants DRY CLEANING STATION, INC. and CAMPBELL breached the

25   Franchise Agreement by failing to fulfill the duties required of them

26   to adequately train and support Plaintiffs in the opening of their

27   store and in the development of their assigned territory, and by the

28   acts and omissions set forth in this complaint.

1  46.  Under Section 7.1, of the Franchise Agreement, DRY CLEANING
2  STATION, INC. was to provide Plaintiffs with an initial training
3  program for ''a period of not less than three (3) nor more than ten
4  (10) days.'' Exhibit A, page 10.

5  47.  The Brosnans performed all conditions required of them by
6  spending money for airfare and hotel reservations in order to attend
7  DRY CLEANING STATION, INC.'s training program in Columbus, Ohio.  The
8  Brosnans also attended the complete training program set forth by DRY
9  CLEANING STATION, INC.

10  48.  However, defendants DRY CLEANING STATION, INC. and CAMPBELL
11  breached the Franchise Agreement by the acts and omissions set forth
12  in this complaint and by providing to Plaintiffs an inadequate and
13  unorganized training program, which did not provide meet the time
14  requirements set forth under the Franchise Agreement.

15  49.  Defendants DRY CLEANING STATION, INC. and CAMPBELL also breached
16  Sections 7.6 and 7.9 of the Franchise Agreement by failing to provide
17  support and assistance to Plaintiffs during the operation of their
18  business. (See pages 13 and 14 of Exhibit A)

19  50.  Defendant DRY CLEANING STATION, INC. breached Section 7.6 of the
20  Franchise Agreement by refusing to respond the Brosnans' requests for
21  assistance.  Even after the Brosnans' request for assistance, DRY
22  CLEANING STATION, INC. failed to provide to the Brosnans at least one
23  of its representatives, in direct violation of Section 7.6 of the
24  Agreement, requiring DRY CLEANING STATION, INC. to ''assist the
25  Franchisee in establishing and standardizing procedures and
26  techniques essential to the operation of the Franchised Business and
27  [to] assist in training the Franchisee's personnel.''

28  51.  Defendant DRY CLEANING STATION, INC. also failed to comply with

1  Section 7.9 (E), page 13 of the Franchise Agreement by failing to

2  ''use its best efforts to diligently respond'' to Plaintiffs'

3  requests for help and assistance in the operation of their business.

4  52.   As a proximate result of DRY CLEANING STATION, INC.'s breach of

5  the Franchise Agreement, Plaintiffs have been damaged in a sum in

6  excess of the jurisdictional minimum of this court.

7  WHEREFORE, the Brosnans pray for judgment as set forth below.

8  **FOURTH CAUSE OF ACTION**

9  **(BREACH OF THE COVENANT OF GOOD FAITH AND FAIR DEALING AGAINST DRY**

10  **CLEANING STATION, INC.)**

11  53.   Plaintiffs allege as though set forth fully herein paragraphs 1

12  through 52.

13  54.   The Franchise Agreement entered into between Plaintiffs and DRY

14  CLEANING STATION, INC. is a contract that contain an implied covenant

15  of good faith and fair dealing, which obligated DRY CLEANING STATION,

16  INC. to perform the terms and conditions of the contract fairly and

17  in good faith and to refrain from doing any act that would prevent or

18  impede Plaintiffs from performing any or all conditions of the

19  contracts that they agreed to perform, or any acts that would deprive

20  Plaintiff of their benefits.

21  55.   Plaintiffs performed all conditions, covenants and promises to

22  be performed on their part in accordance with the Franchise

23  Agreement, except those provisions which are excused.

24  56.   DRY CLEANING STATION, INC. knew Plaintiffs fulfilled all their

25  duties and conditions under the franchise agreement.

26  57.   DRY CLEANING STATION, INC. breached the implied covenant of good

27  faith and fair dealing under the contract by engaging in the conduct

28  complained of herein.

Law Office Of Michael D. Liberty
1290 Howard Ave., Suite 303
Burlingame, CA 94010
650.685.8085

1    58.  As a result of DRY CLEANING STATION, INC.'s breach of the

2    implied covenant of good faith and fair dealing, Plaintiffs have

3    suffered economic losses and other general, consequential and

4    specific damages, including reliance damages, according to proof.

5    WHEREFORE, the Brosnans pray for judgment as set forth below.

6                          **FIFTH CAUSE OF ACTION**

7         **(NEGLIGENCE AGAINST ALL DEFENDANTS AND DOES 1 THROUGH 20)**

8    59.  Plaintiffs allege as though set forth fully herein paragraphs 1

9    through 58.

10   60.  Based on, inter alia, upon the foreseeability of harm to

11   Plaintiffs, defendants and/or Does 1 through 20, inclusive, owe them

12   a duty of due care to act reasonably under the circumstances in the

13   formation, administration and handling of the franchise relationship

14   in question.

15   61.  Defendants breached their duties to Plaintiffs by the actions

16   set forth in this complaint.

17   62.  As a direct and proximate result of defendants' breach of their

18   duties, Plaintiffs have suffered damages in an amount to be proven at

19   trial.

20   WHEREFORE, the Brosnans pray for judgment as set forth below.

21                          **SIXTH CAUSE OF ACTION**

22        **(BREACH OF FIDUCIARY DUTY AGAINST ALL DEFENDANTS)**

23   63.  The Brosnans allege as though set forth fully herein paragraphs

24   1 through 62.

25   64.  By virtue of the relationship between Defendants and the

26   Brosnans, and of the trust and confidence placed in them by the

27   Brosnans, and of the monies entrusted to them, defendants owed the

28

Law Office Of Michael D. Liberty
1290 Howard Ave., Suite 303
Burlingame, CA 94010
650.685.8885

COMPLAINT FOR DAMAGES
13

1  Brosnans a duty of the utmost loyalty, fidelity and honor and
2  occupied fiduciary positions.

3  65.  Defendants breached that fiduciary duty by their acts and
4  omissions set out in this complaint.

5  66.  As a proximate result of the Defendants' actions, the Brosnans
6  have been damaged in excess of the jurisdictional minimum of this
7  court which will be proven at trial.

8  67.  In performing these acts, Defendants acted with oppression,
9  fraud and malice entitling The Brosnans to exemplary damages in an
10  amount which will be proven at trial.

11  WHEREFORE, the Brosnans pray for judgment as set forth below.

12  **SEVENTH CAUSE OF ACTION**

13  **(BREACH OF CORPORATIONS CODE § 31000, ET SEQ. AGAINST ALL DEFENDANTS)**
14  68.  Plaintiffs allege as though set forth fully herein paragraphs 1
15  through 67.

16  69.  Under section 31001 of the Corporations Code, DRY CLEANING
17  STATION, INC. and CAMPBELL had a duty to provide plaintiffs with
18  complete information regarding the franchisor-franchisee
19  relationship, the details of the contract between franchisor and
20  franchisee, and the prior business experience of the franchisor.

21  70.  DRY CLEANING STATION, INC. and CAMPBELL had a duty to provide
22  plaintiffs with the information necessary to make an intelligent
23  decision regarding franchises being offered.

24  71.  By their acts and omissions set forth in this complaint, Dry
25  Cleaning Station, Inc. and CAMPBELL by Section 31302 of the
26  Corporations Code, violated section 31001.

27  72.  DRY CLEANING STATION, INC. is liable as principal for the
28  actions of its agent, CAMPBELL under the imputed liability provision

Law Office Of Michael D. Liberty
1290 Howard Ave., Suite 303
Burlingame, CA 94010
650.685.8885

1  found in Section 31302.

2  73.  Defendants DRY CLEANING STATION, INC. and CAMPBELL breached

3  Section 31201 by engaging in the conduct complained of herein.

4  WHEREFORE, the Brosnans pray for judgment as set forth below.

### EIGHTH CAUSE OF ACTION

6  **(UNFAIR BUSINESS PRACTICES AGAINST ALL DEFENDANTS: BUSINESS AND**

7  **PROFESSIONS CODE SECTION 17200)**

8  74.  The Brosnans alleges as though set forth fully herein paragraphs

9  1 through 73.

10  75.  Through their acts and omissions as set forth above, defendants

11  have engaged in unfair business practices in violation of section

12  17200 et seq. of the Business & Professions Code.

13  76.  As a direct result of the unfair competition, the Brosnans are

14  entitled to an injunction enjoining defendants from enforcing the

15  franchise agreements, and in a knowing and willful course of conduct

16  directed at the Brosnans which seriously harms the Brosnans, and

17  which serves no legitimate purpose, as set forth below and for

18  restitution of moneys paid to defendants.

19  77.  As a further result of the unfair competition, the Brosnans are

20  entitled to restitution of defendants' ill gotten gains wrongfully

21  paid to defendants by the Brosnans.

22  WHEREFORE, The Brosnans prays for judgment as follows:

23  1. For compensatory and special damages in excess of the

24  jurisdictional minimum of this court according to proof, but not less

25  than $495,000;

26  2. For interest on damages according to proof;

27  3. For exemplary damages according to proof;

28  4. For attorney fees and costs of suit according to proof;

1   5. For rescission;

2   6. For injunctive relief against Defendants, and each of them, to

3   prevent future wrongful conduct, and to prevent them from enforcing

4   the terms of the Franchise Agreement;

5   7. For restitution under the 17200 claim;

6   8. For such further relief as the Court deems appropriate.

7

8

    DATED: March 17, 2008                LAW OFFICE OF MICHAEL D. LIBERTY

9

10                                       By:
                                         Michael D. Liberty
11                                       Attorney for Plaintiffs
                                         TIMOTHY BROSNAN and
12                                       CARLA BROSNAN

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

# FRANCHISE AGREEMENT

## BETWEEN

## DRY CLEANING STATION, INC.

## AND

## TIM AND CARLA

## BROSNAN

### 1558 RALSTON AVENUE

### BURLINGAME, CA  94010

### (650) 344-7553

## FRANCHISED AREA:

### SAN FRANCISCO, CALIFORNIA PER

### THE TERRITORIAL DEVELOPMENT AGREEMENT

*Exhibit A*

# DRY CLEANING STATION

## TABLE OF CONTENTS

| ARTICLE | DESCRIPTION | PAGE |
|---------|-------------|------|
| I | Recitals | 1 |
| II | Acknowledgements | 2 |
| III | Certain Definitions | 3-5 |
| IV | Grant of Franchise | 5-6 |
| V | Term and Successor Agreements | 6-8 |
| VI | National Accounts | 8-10 |
| VII | Services of the Company | 10-15 |
| VIII | Opening and Operation of the Franchised Business | 15-19 |
| IX | Trademarks | 19-20 |
| X | Fees | 20-21 |
| XI | Advertising and Promotion | 21-24 |
| XII | Relationship of Parties/Indemnification | 24-25 |
| XIII | Insurance | 25-26 |
| XIV | Reports, Financial Statements, and Audit Rights | 26-28 |
| XV | Transfer of Franchise | 28-31 |
| XVI | Right of First Refusal | 31-32 |
| XVII | Default & Termination | 32-36 |
| XVIII | Post Relationship Obligations | 36 |
| XIX | Non-Competition Covenants | 37 |
| XX | Enforcement | 37-40 |
| XXI | Miscellaneous | 40-43 |

# FRANCHISE AGREEMENT

THIS FRANCHISE AGREEMENT made and entered into this 8th day of August, 2005, by and between the DRY CLEANING STATION, INC., a Nebraska corporation, having its principal office at 8301 Golden Valley Road, Suite 240, Minneapolis, Minnesota 55427 (herein called the "Company") and Carla and Tim Brosnan, having principal offices at 1558 Ralston Avenue, Burlingame, CA 94010, (herein called the "Franchisee").

## ARTICLE I.
## RECITALS

1.1     The Company has developed certain formats, systems, methods, procedures and standards for establishing, developing and operating low price dry cleaning establishments (herein called the "System").

1.2     The distinguishing characteristics of the System include, without limitation, a unique, specially designed and readily recognizable facility for the premises wherein such business is conducted; exterior and interior design, decor, layout and color scheme, including signage, decorations, furnishings and materials; confidential operating procedures; methods and techniques for quality, inventory and cost controls, record keeping, accounting and reporting, personnel management, purchasing, sales promotion, marketing and advertising; all of which may be changed, improved and further developed by Company from time to time.

1.3     The Company is the owner of and has the right to license the use of the mark Dry Cleaning Station[®] and the trademarks, service marks, logos, and trade names now or hereafter used in connection with the System (herein called the "Marks").

1.4     The Company grants to persons, who meet the Company's qualifications and are willing to undertake the investment and effort, a franchise to establish and operate a Dry Cleaning Station[®] store at a specified location and a license to use the Marks in connection therewith.

1.5     The Franchisee desires a franchise to establish and operate a Dry Cleaning Station[®] store and the Company is willing to grant such a franchise on the terms and conditions hereinafter set forth.

NOW, THEREFORE, the parties, in consideration of the undertakings and commitments of each party to the other party, hereby agree as follows:

1

## ARTICLE II.
## ACKNOWLEDGMENTS

The Franchisee acknowledges, and represents to the Company to induce the Company to enter into this Agreement, as follows:

2.1    The Franchisee has read this Agreement and the Company's Uniform Franchise Offering Circular; the Company has explained the provisions thereof to the Franchisee's satisfaction and the Franchisee understands and accepts the terms, conditions and covenants contained in this Agreement as being reasonably necessary to maintain the Company's standards of quality and service at all Dry Cleaning Station® franchised stores in order to protect and preserve the goodwill of the Marks.

2.2    The Franchisee has conducted an independent investigation of the business contemplated by this Agreement and has had an opportunity to consult with professional advisors.    The Franchisee recognizes that the nature of the business conducted by the Company may evolve and change over time, that an investment in the franchised business involves business risks and that the success of the venture depends primarily upon the Franchisee's business ability and efforts.

2.3    The Franchisee has not received or relied upon any guaranty, express or implied, about the revenues, profits or success of the business venture contemplated by this Agreement.

2.4    No representations have been made by the Company, or by its officers, directors, shareholders, employees, salespersons or agents, that are contrary to the statements made in the Uniform Franchise Offering Circular heretofore received by the Franchisee or to the terms contained in this Agreement.

2.5    The information contained in the application made by Franchisee to the Company as an inducement to the Company entering into this Agreement is true and correct and contains no incorrect statements nor fails to make any statement that would be necessary to make the statements made not misleading.

2.6    Other franchisees of the Company have or will be granted franchises at different times and in different situations and the provisions of such franchises may vary substantially from those contained in this Agreement.

2.7    The Franchisee has received a copy of this Agreement at least five (5) business days prior to the date on which this Agreement was executed and the Franchisee has received the Company's Uniform Franchise Offering Circular on the earliest of  (a) the first personal meeting to discuss the franchise; or  (b) at least ten (10) business days prior to the date on which this Agreement was executed; or  (c) at least ten (10) business days prior to any payment to the Company.

2

DCS – FA
11/15/04

## ARTICLE III.
## CERTAIN DEFINITIONS

3.1    Advertising Area, Advertising Group and Local Cooperative Advertising Fund.  The term "Advertising Area" shall mean that geographic area designated by the Company which encompasses two or more Franchised Businesses.  The franchisees of all the Franchised Businesses in the Advertising Area (and the Company if it operates such a business) shall constitute an "Advertising Group".  The common local cooperative fund into which the Advertising Requirements of the Advertising Group members shall be contributed, up to one (1%) percent of monthly Gross Revenues, shall constitute an "Local Cooperative Advertising Fund".

3.2    National Advertising Fee.  The term "National Advertising Fee" shall mean an amount equal to one and one-half (1.5%) percent of Franchisee's monthly Gross Revenues which the Company has the right to require the Franchisee to pay to the Company, in addition to the Franchisee's Local Advertising Requirement as the Franchisee's contribution to the Dry Cleaning Station National Advertising Fund.

3.3    Local Advertising Requirement.  The term "Local Advertising Requirement" shall mean an amount equal to one percent (1%) of Gross Revenues of the Dry Cleaning Station per month.

3.4    Franchised Business.  The term "Franchised Business" or "Business" shall mean the operation of a Dry Cleaning Station at the Franchised Location utilizing, in connection therewith, the System and the Marks.

3.5    National Advertising Fund.  The term "National Advertising Fund" shall mean that central fund which may be established by the Company as such time as there are at least two hundred (200) Franchised Businesses to pool National Advertising Fees to publicize the system and Franchised Businesses in general.

3.6    Franchised Location.  The term "Franchised Location" or "Location" shall mean:

A.    If the location of the Franchised Business has been selected and approved on the date of this Agreement, that location situated within the geographic area described in subparagraph B hereof and specifically described as follows:

_____

_____

B.    If the location of the Franchised Business has not been selected and approved on the date of this Agreement, that location which, when selected and approved by the parties, shall be described in an exhibit which they shall initial and annex hereto as "Exhibit 3.6 B".  When annexed hereto, said Exhibit shall be incorporated into this Agreement as fully as though set forth herein in full.  The Franchised Location shall be selected from the area described as follows:

3

DCS – FA
5/01/03

San Francisco, California per the Territorial Development Agreement

The Franchisee acknowledges that this area is merely a search area and the Franchisee has no exclusive right to seek a location for a Dry Cleaning Station® store within this area.

    3.7   Grand Opening.  The term "Grand Opening" shall mean the special advertising and promotion program implemented within sixty (60) days after the Franchised Business is opened for business.

    3.8   Gross Revenues.  The term "Gross Revenues" shall mean and include the total receipts of all money or property of any kind, for or in connection with the services rendered or products sold by Franchisee at the Franchised Location, or otherwise in connection with the Franchised Business.  The term shall be deemed to include deposits, checks, drafts, and all other instruments of payment received by Franchisee, whether or not the same are postdated or are later dishonored or rescinded, or payment is stopped thereon.  The term shall not include applicable sales, use or service taxes which Franchisee may be required to remit to State or Municipal taxing authorities.  If the Franchised Business is a Full Service Store, Gross Revenues shall not include consideration received from a Drop Station Store for garment cleaning services performed by the Franchisee on behalf of a Drop Station Store.  If the Franchised Business is a Plant Store, Gross Revenues shall not include consideration received from a Drop Station Store or a Full Service Store for garment cleaning services performed by the Franchisee on behalf of the Full Service or Drop Station Store.

    3.9   Initial Franchise Fee.  The term "Initial Franchise Fee" shall mean Thirty Five Thousand Dollars ($35,000.00) for a Full Service Store or a plant store and Twenty Five Thousand ($25,000.00) Dollars for a Drop Station Store.

    3.10  Premises.  The term Premises shall mean the land and building from which the Franchised Business is conducted on the Franchised Location.

    3.11  Protected Area.  The term "Protected Area" shall mean a circular geographic area having the Franchised Location as its center and a radius extending therefrom of one and one half (1 1/2) miles and described as follows:

_____
_____

    3.12  Royalty Fee.  The term "Royalty Fee" shall mean an amount equal to five percent (5%) of monthly Gross Revenues unless the Franchisee has entered into a Territorial Development Agreement with the Company, in which case the lower royalty fee in the Territory Development Agreement shall govern.

4

DCS – FA
11/15/04

3.13    Transfer Fee.    The term "Transfer Fee" shall mean Five Thousand ($5,000.00) Dollars.

3.14    Territorial Development Agreement.    The term "Territorial Development Agreement" (sometimes "TDA") shall mean that agreement which a franchisee may enter into at the time of entering into this Agreement under which the Franchisee is granted the right to open and operate a certain number of Dry Cleaning Station® stores in a specified area.  The royalty rates for Dry Cleaning Station® stores opened pursuant to a TDA may be less if certain numbers of Drop Station and/or Full Service Stores are achieved.

3.15    Drop Station Store(s).  The term "Drop Station Store" shall mean a retail Dry Cleaning Station® store that does not have a plant or equipment on the Premises for processing and laundering garments and other clothes.

3.16    Full Service Store(s).  The term "Full Service Store" shall mean a retail Dry Cleaning Station® store that also has a plant and equipment on the Premises for processing and laundering garments and other clothes.

3.17    National Account.   A National Account shall be considered an account having multiple locations, at least one of which is located outside the Protected Area.

3.18    Plant Store.  The term "Plant Store" shall mean a Dry Cleaning Station® store that does not provide retail services but has a plant and equipment on the Premises for processing and laundering garments for other Drop Station and Full Service Stores and other retailers.

## ARTICLE IV.
## GRANT OF FRANCHISE

4.1    Grant of Franchise and License.  Subject to the terms and conditions herein, the Company hereby grants to the Franchisee, and the Franchisee hereby accepts from the Company,  (A) a non-exclusive franchise to open and operate one (1) Franchised Business and  (B) a non-exclusive license to use the Marks solely in connection with the operation of the Franchised Business.  Termination or expiration of this Agreement shall constitute a termination of the foregoing franchise and license.

4.2    Retention of Rights.  Except as explicitly and specifically granted to the Franchisee herein, all rights in and to the Marks and the System, and the goodwill associated with each of them is hereby reserved to the Company.  Specifically, but without limitation, the Company retains the right, but shall not be obligated, to:

A.    add new programs, products and/or services to be offered through the Franchised Business at any time;

B.    establish, operate and franchise any other programs, product and/or service under trade names, trademarks, service marks or logos other than the Marks.

5

DCS – FA
11/15/04

4.3   <u>Territorial Rights</u>.   So long as this Agreement is in effect and if the Franchisee is in substantial compliance with this Agreement, the Company will not operate or grant a franchise for another Dry Cleaning Station® franchised store within the Protected Area.

### ARTICLE V.
### <u>TERM AND SUCCESSOR AGREEMENTS</u>

5.1   <u>Term</u>.   The term of this Agreement shall be fifteen (15) years commencing on the date of this Agreement (the "Term").

5.2   <u>Right to Obtain Successor Agreements</u>.   The Franchisee shall have the right to obtain two successor franchise agreements of five (5) years each (the "Successor Agreement"), provided that the following conditions have been met in each instance.   The failure by the Franchisee to sign such agreements and any releases within thirty (30) days after delivery thereof to the Franchisee shall be deemed an election by the Franchisee not to obtain such Successor Agreements.

A.   The Franchisee has given the Company notice at least one hundred eighty (180) days prior to the end of the Term or the term of the first Successor Agreement of its intention to obtain a Successor Agreement, (but not earlier than two hundred seventy (270) days prior thereto);

B.   The Franchisee shall have the right to occupy the Premises or such other location approved by the Company in writing, for a period ending not sooner than the expiration of the term of the Successor Agreement;

C.   The Franchisee has complied with all the material terms and conditions of this Agreement or the Successor Agreement, has complied with the Company's operating and quality standards and procedures, has operated the Franchised Business utilizing and conforming to the System, and has utilized exclusively the Marks in the operation of the Franchised Business;

D.   All monetary obligations owed by the Franchisee to the Company have been satisfied when due, throughout the Term or, if applicable, the term of the first Successor Agreement;

E.   The Franchisee agrees in writing to make such reasonable expenditures necessary to upgrade, remodel and redecorate the Premises and the fixtures, equipment and supplies used in the Franchised Business to conform to the image of the Franchised Business at the commencement of the Successor Agreement; and

F.   The Franchisee executes the then-current franchise agreement and other forms the Company is then requiring of new franchisees, except that the Franchisee will not be required to pay an initial franchisee fee and any pre-opening obligations of the

6

DCS – FA
11/15/04

Company shall be waived, and further provided that such then-current franchise agreement shall be modified consistent herewith so that Franchisee shall have in the aggregate the right to obtain no more than one additional Successor Agreement with a term of five (5) years.

If the Company does not provide the Franchisee with notice of nonrenewal of this Agreement or a Successor Agreement, whichever is applicable, but the Franchisee does not sign a Successor Agreement prior to the expiration of this Agreement or the first Successor Agreement, but continues to operate the Franchised Business beyond such expiration, then at the option of the Company, this Agreement or the first Successor Agreement, whichever the case may be, may be treated either as: (i) expired as of the date of expiration with the Franchisee then operating without a franchise to do so and in violation of the Company's rights; or (ii) continued on a month-to-month basis (the "Interim Period") until one party provides the other with written notice of such party's intention to terminate the Interim Period, in which case the Interim Period will terminate thirty (30) days after receipt of the notice to terminate the Interim Period. In the latter case, all obligations of the Franchisee shall remain in full force and effect during the Interim Period as if this Agreement or the Successor Agreement, whichever the case may be, had not expired, and all obligations and restrictions imposed on the Franchisee upon expiration of this Agreement or the Successor Agreement, whichever the case may be, shall be deemed to take effect upon termination of the Interim Period.

5.3     Form and Manner of Exercising Right to Obtain a Successor Agreement. The Franchisee shall exercise its right to obtain a Successor Agreement in the following manner:

A.     Not less than one hundred eighty (180) days nor more than two hundred seventy (270) days before the expiration of the Term, or the term of the first Successor Agreement, the Franchisee shall request from the Company a copy of its then-current Uniform Franchise Offering Circular for the Franchised Business (the "Offering Circular").

B.     As soon as practicable after receipt of the Franchisee's request, the Company shall deliver to the Franchisee a copy of the Offering Circular. Promptly upon receipt of the Offering Circular, the Franchisee shall acknowledge its receipt by executing and delivering to the Company the form prescribed therefor in the Offering Circular.

C.     The Franchisee shall notify the Company of its election to obtain a Successor Agreement no later than thirty (30) business days after receipt of the Offering Circular, provided that such notice is given in any event not less than one hundred eighty (180) days prior to the end of the Term or the term of the first Successor Agreement.

D.     The Company shall deliver to the Franchisee two (2) copies of the Company's then-current form of franchise agreement, modified as provided herein, promptly following receipt of the Franchisee's notice of its election to obtain a Successor Agreement. The Franchisee shall execute two (2) copies thereof within thirty (30) days of receipt of the agreements, and shall return both copies to the Company.

7

E.    If Franchisee fails to perform any of the acts, or to deliver any of the notices required pursuant to the provisions of subparagraph A, B, C, or D, of this Section in a timely manner, such failure shall be deemed an election by the Franchisee not to exercise its right to obtain a Successor Agreement and such failure shall cause the Franchisee's right to obtain a Successor Agreement to lapse and expire.

F.    If the Franchisee has exercised its right to obtain a Successor Agreement in the form and manner described above and if, on the date of expiration of the Term or the term of the first Successor Agreement, the Franchisee has complied with all of the conditions contained in this Article V, the Company shall execute the copies of franchise agreement previously executed by the Franchisee and, promptly after expiration of the Term or the term of the first Successor Agreement, deliver one (1) fully executed copy thereof to the Franchisee.

## ARTICLE VI.
## NATIONAL ACCOUNTS

6.1    The Company reserves the right to market to National Accounts, without regard to whether or not such Accounts may be located, or have locations, in the Protected Area. The Company may attempt to solicit National Accounts by which the Company and its franchisees will have the opportunity to offer services to the National Accounts.

6.2    The Franchisee must request permission in writing to solicit any National Account, and proceed with solicitation only after receiving written approval from the Company and then only in accordance with such terms and conditions as may be set forth in such written approval. If the Franchisee obtains the National Account, it may only service the locations of the National Account that are located within the Protected Area and such others as are agreed to in writing by the Company. The Franchisee acknowledges, however, that if the Company approves Franchisee's solicitation or service of a National Account, such approval may be withdrawn for any reason upon thirty (30) days notice to Franchisee, and further that approval of the Franchisee's service of a location outside the Protected Area is likely to be withdrawn if another Dry Cleaning Station$^{®}$ store is in closer proximity to such location, or if the Company believes another Dry Cleaning Station$^{®}$   store is better able to service that location. Moreover, the Franchisee shall provide information to the Company as to the terms under which the Franchisee is servicing the National Account and any additional information, including the availability of any locations of the National Account, so as to enable the Company to service such locations, or assign another person to service those locations.

6.3    The Franchisee shall follow all policies and procedures established by the Company for each National Account in connection with the provision of services to a National Account including, but not limited to, those set forth in any agreement between the Company and the Franchisee with respect to the National Account and any addenda that may be issued from time to time by the Company. With respect to any addenda, if

8

the Franchisee services a National Account, the Franchisee will be deemed to have accepted the addenda regardless of whether or not the Franchisee signs the addenda. Any breach or violation of the agreement or any addenda thereto shall be considered a material breach of this Agreement.

6.4    If the Company enters into an arrangement with a National Account the Franchisee acknowledges that it has no right to service that Account or any location of that Account even if it is located in the Franchisee's Protected Area, unless the Company appoints the Franchisee to service the Account or location.    The Franchisee acknowledges that the Company, another franchisee or an affiliate of the Company may service the National Account or the location of the Account even if it is located in the Franchisee's Protected Area.    However, if the Company appoints the Franchisee to service a National Account or otherwise consents to the Franchisee servicing the Account or a location of the Account pursuant to Section 6.2 above, the Company shall have the right to appoint itself, an affiliate, or any other party, to service the location, without compensation to the Franchisee if:

A.    The Franchisee is not in compliance with this Agreement;

B.    The Franchisee does not enter into an account agreement with the Company under which the Franchisee agrees to service the National Account, or after entering into such an agreement, has breached that agreement;

C.    The Franchisee's agreement to service the National Account with the Company is terminated, expires or is assigned;

D.    The National Account notifies the Company that it is dissatisfied with the Franchisee's servicing of the National Account and requests the Company appoint another Dry Cleaning Station® store to service the account; or

E.    The Company determines that the volume of business from the National Account requires more than one franchisee to service the National Account, in which case the Company shall have the right to appoint itself, an affiliate or other franchisees to service the National Account with the Franchisee.

6.5    The Franchisee agrees that any attempt by the Franchisee to interfere with any agreement between the Company and a National Account, or with the Company's termination of the Franchisee's right to service any location of a National Account in accordance with the foregoing provisions or the terms of the agreement, is a material default of this Agreement that will substantially impair the goodwill of the Company with its National Accounts.

6.6    The Franchisee agrees and acknowledges that the Company is in the initial stages of developing its National Account program.    The Franchisee further acknowledges and agrees that the Company's termination of Franchisee's right to service

9

DCS – FA
11/15/04

a National Account shall not constitute the termination of any franchise right of the Franchisee, nor shall it constitute a constructive termination of this Agreement.

## ARTICLE VII.
## SERVICES OF THE COMPANY

Pre-Opening.

7.1 Initial Training.

A.      Within one hundred eighty (180) days after the date hereof, the Franchisee, and such managers as the Franchisee shall designate, shall attend and have completed, to the Company's satisfaction, the Company's initial training program. The initial training program shall be conducted in Columbus, Ohio, or at such other place as Company shall designate, over a period of not less than three (3) nor more than ten (10) days.

All expenses incurred by the Franchisee and its designated managers in attending such training program including, without limitation, travel, room and board expenses shall be the sole responsibility of the Franchisee. No person may be employed as a manager of the Franchised Business unless such person has completed such training to the Company's satisfaction. If the initial training is completed by the Franchisee's manager, and the manager leaves the employ of the Franchisee or the Franchisee requests that the initial training be provided to additional persons, the Company will provide the additional initial training. The replacement manager shall have completed the initial training to the Company's satisfaction within thirty (30) days of the date he or she is hired by the Franchisee or begins performing services for the Franchisee. The Franchisee shall pay to the Company the fee set by the Company for such additional initial training, plus reimbursement of the Company's travel, lodging, and incidental expenses, if any, associated with the training, within ten (10) days of the invoice date.

B.      If the Company determines that the Franchisee is unable to satisfactorily complete the initial training program, the Company shall have the right to terminate this Agreement in the manner provided herein. Upon such termination, the Company may retain $12,500.00 plus its out-of-pocket expenses incurred by the Company related to the franchise granted hereunder and, upon the return to the Franchisee of the balance of the money paid to or deposited with the Company as provided herein, the Company shall be fully and forever released from any claims or causes of action the Franchisee may have under or pursuant to this Agreement and the Franchisee shall have no further right, title or interest in the Franchised Business, Marks or the System.

7.2     Confidential Operating Manuals, Computer and Software, Confidentiality and Improvements.

A.      The Franchisee agrees that the success of the Dry Cleaning Station® system depends on the goodwill generated by strict consistency in the quality of professional service and cleanliness which customers expect to encounter at every Dry

10

DCS – FA
11/15/04

Cleaning Station® store. This conformity can be achieved only by the adherence by the Franchisee to a consistent plan of operation. To this end, the Company has created and continues to improve one or more manuals, copies of which will be loaned to the Franchisee for the Term of this Agreement and any Successor Agreement. The manuals contain mandatory and suggested specifications, uniform standards of quality and service, operating procedures, requirements and rules prescribed from time to time by the Company for the Franchised Business for the protection of the valuable goodwill symbolized by the Marks and the System. The Franchisee acknowledges that these manuals are designed to protect the Company standards, System, and Marks, and not to control the day-to-day operation of the Franchised Business. Mandatory specifications, standards, operating procedure, techniques and other rules prescribed from time to time by the Company, such as, the Franchisee's requirements to purchase required computers and to lease the Company's proprietary software, if any, from one supplier, and the Company's other cash control and service control systems, by amendment of or supplement to the manuals and/or in notices and bulletins furnished to the Franchisee, shall constitute provisions of this Agreement as if fully set forth herein. The Franchisee will correct any nonconformance with the manuals within thirty (30) days after receiving written notice of such nonconformance from the Company.

All references herein to this Agreement shall include all such mandatory specifications, standards and operating procedures and rules contained in the manuals, and the Franchisee shall strictly comply with all such mandatory specifications, standards, operating procedures and rules. The manuals contain proprietary information of the Company and shall be kept confidential by the Franchisee both during the Term of this Agreement or the term of any Successor Agreement and after their expiration, termination or assignment. The Franchisee shall not at any time copy, duplicate, record, or otherwise reproduce the manuals, in whole or in part, nor otherwise make the same available to any unauthorized person. The Company shall have the right to add to and otherwise modify the manuals from time to time.

B.    The manuals shall at all times remain the sole property of the Company and shall promptly be returned upon the expiration, termination or assignment by the Franchisee of this Agreement.

C.    The Franchisee shall at all times insure that its copy of the manuals is kept current and up to date and in the event of any dispute as to the contents, the terms of the master copy of the manuals maintained by the Company at the Company's principal office shall be controlling.

D.    The Franchisee acknowledges that all information it has now or obtains in the future concerning the System, and the concepts and methods of promoting the Franchised Business, including, but not limited to, all information and manuals, including materials, expertise, intellectual property (regardless of form) and proprietary software, if any, is derived from the Company pursuant to this Agreement and that such information shall be treated in confidence. The Franchisee shall never, directly or indirectly, engage in or abet the misappropriation, disclosure, divulgence or distribution of all or any part of

11

DCS – FA
11/15/04

the System, except on a need-to-know basis as ordered by any regulator, or judicial authority having legal jurisdiction.

E.    If the Franchisee, during the franchise relationship, conceives or develops any improvements or additions to the System, copyrightable works, Internet web pages or any other documents or information pertaining or relating to the System or the Franchised Business, or any advertising or promotion ideas related to the Franchised Business (collectively, the "Improvements"), the Franchisee shall fully disclose the Improvements to the Company, without disclosure of the Improvements to others, and shall obtain the Company's written approval prior to the use of such Improvements.    Any such Improvement approved by the Company may be used by the Company and all other franchisees of the Company without any obligation to the Franchisee for royalties or similar fees.  The Franchisee shall assign to the Company, without charge, any rights for such Improvement, including the right to grant sublicenses to any such Improvement. The Company, at its discretion, may make application for and own copyrights, patents, trade names, trademarks and service marks relating to any such Improvement and the Franchisee shall cooperate with the Company in securing such rights.  The Company also may consider such Improvements as the property and trade secret of the Company.  The Company shall authorize the Franchisee to utilize any Improvement authorized generally for use by other franchisees.

7.3    Site Assistance and Approval.  If the Franchised Location has not been selected and approved on the date hereof, the Company shall be available to the Franchisee, at the Franchisee's reasonable request, for advice with respect to site selection and acquisition, and recommendations with respect to architects, engineers, and technical personnel.  While the Company agrees to make such recommendations and give such advice based upon its prior experience, the Company makes no warranty or representation as to the skill or performance of the persons recommended by the Company.  The Company shall provide the Franchisee the criteria that the Company has established for the selection of sites suitable for the location of the Franchised Business. The Franchisee is solely responsible for locating and procuring a site acceptable to the Company.  The Franchisee shall not develop a Franchised Business at any location nor enter into any lease or purchase agreement for a site for the Franchised Business without the Company's prior written consent.  The Company's consent is a permission only and is not, and does not imply, any assurance, representation or guarantee of the suitability for, or prospects of, a site for the Franchised Business.

7.4    Company Approval.  The Company shall have the right to approve the Premises as having been completed in accordance with the Company's specifications and to determine that the Franchisee and the Franchisee's manager, if applicable, have satisfactorily completed the Company's initial training program prior to the opening of the Franchised Business.

7.5    Quality of Services.  If the Franchisee believes the Company has failed to adequately provide any pre-opening services to Franchisee in regard to the initial training, selection and purchase of equipment and supplies, or any other matter affecting the

12

DCS – FA
11/15/04

establishment of the Franchised Business, the Franchisee shall notify the Company in writing within thirty (30) days following the opening of the Franchised Business. Absent the timely provision of such notice to the Company, the Franchisee shall be deemed to conclusively acknowledge that all pre-opening and opening services required to be provided by the Company were sufficient and satisfactory in the Franchisee's judgment.

### Post Opening

**7.6    Initial Assistance.** If this is your first franchised location to open within thirty (30) days after the opening of the Franchised Business to the general public, the Company shall provide for two (2) days, at least one of the Company's representatives to the Franchisee at the Franchised Location for the purpose of facilitating the opening of the Franchised Business. During this period, such representative(s) will assist the Franchisee in establishing and standardizing procedures and techniques essential to the operation of the Franchised Business and shall assist in training the Franchisee's personnel. If this is not your first location, the Company will provide training at your written request as needed for up to two (2) days.

**7.7    Grand Opening.** In addition to the initial assistance to the Franchisee, the Company shall, during the initial thirty (30) days after the opening of the Franchised Business to the general public, provide the Franchisee with marketing and promotional assistance in connection with the Grand Opening.

**7.8    Additional Training/Conventions.** The Company from time to time may require that previously trained and experienced franchisees or their managers attend and successfully complete refresher training programs or seminars to be conducted at the Company's principal offices or at such other location mutually convenient to the parties that the Company shall designate. The Franchisee and/or the Franchisee's manager(s) shall attend such programs or seminars at the Franchisee's expense, provided that such attendance will not be required at more than two (2) such programs in any calendar year. The Company may conduct annual conventions for all Dry Cleaning Station® franchisees. If the Company chooses to hold such conventions, Franchisee will be required to attend these conventions or to send an approved representative. Regardless whether Franchisee attends the annual convention, it shall pay to the Company any convention fee established by the Company for that convention, within ten (10) days of the date of the invoice for such fee.

**7.9    Guidance.** During the operation of the Franchised Business the Company will:

A.    inspect the Franchised Business as often as the Company deems necessary;

B.    render, upon written request of the Franchisee, advisory services pertaining to the operation of the Franchised Business;

13

C.     provide the Franchisee with all supplements and modifications to the manuals;

D.     provide the Franchisee with forms to be used by the Franchisee to report to Company all information required by the Company.

E.     make its staff available at its principal offices for consultation and guidance of Franchisee in the operation and management of the Franchised Business.    The Franchisee shall have the right to ask the Company's headquarters' staff, its field representatives, and its training staff about problems relating to the operation of the Franchised Business, by telephone or written correspondence and the Company shall use its best efforts to diligently respond to such inquiries.

7.10   Operating Assistance.   The Company shall have the right to enter and inspect the Premises at all reasonable times during normal business hours to observe the manner in which the Franchisee is operating the Franchised Business, to confer with the Franchisee's employees and customers and to ascertain that the merchandise, equipment, products, supplies, inventory, services, and operations are satisfactory and meet the quality control and performance standards established by the Company from time to time.   The Franchisee will cooperate with the Company and will immediately correct any deficiencies brought to the Franchisee's attention.   The Franchisee will reimburse the Company for reasonable costs and expenses the Company may incur in correcting deficiencies that the Franchisee fails to correct.

7.11   Advertising/Public Relations.

A.     National Advertising.   The Company may, but shall not be obligated to establish and operate a National Advertising Fund in connection with which the National Advertising Fee required of the Franchisee and other Dry Cleaning Station® franchisees for central advertising as provided herein shall be pooled, managed and expended.   Such Fund shall be managed as provided in Section 11.3 hereof.

B.     Advertising Assistance.   The Company may, from time to time, provide to the Franchisee advertising plans, advice, and advertising and promotional materials such as brochures, newspaper ad slicks, television and radio tapes and films, and on-site merchandising, promotional and public relations materials. One copy of all materials will be provided, when available, to the Franchisee or if the Franchises is a member of an Advertising Group, to that Advertising Group. The Company shall have no obligation to pay any amount for the use of such materials by the Franchisee in local advertising and promotion.

C.     Websites.   The Franchisee shall, if offered by the Company, participate in the Company's website.    The Company may establish a secure access area on the website, available to franchisees generally, and the Franchisee will be given a password for access to such site.   Franchisee acknowledges that the Company owns all content including, but not limited to, any advertising on the Company's website.   Any

14

revenue derived from the Company's website is the property of the Company. The Franchisee may also establish a website to promote the Franchised Business. The Franchisee will comply with all directives from the Company with respect to materials posted on its website, links to and from its website, the use of the Marks on the website and security for the website.

## ARTICLE VIII.
## OPENING AND OPERATION OF THE FRANCHISED BUSINESS

8.1     Franchised Location.  If the location for the Franchised Business has not been selected on the date hereof, the Franchisee shall use its best efforts to find a location satisfactory to the Company within the area described in Section 3.6.B.  The Franchisee may relocate the Franchised Business, with the Company's prior written approval, without obligation to pay the Company an additional initial franchisee fee.

8.2     Construction of Premises.

A.     Specifications for Building, Equipment, Signs and Supplies.     Before commencement of construction at the Franchised Location, the Franchisee shall request and the Company shall deliver to the Franchisee, specifications for the building, equipment, furnishings, decor, layout and signs relating to the Franchised Business and shall consult and advise the Franchisee with respect thereto. The Company shall provide the Franchisee with a list of all equipment, supplies and other products and services reasonably necessary for the opening and operation of the Franchised Business and with lists of approved vendors, sources of supply and standard specifications for the Premises including the signage equipment and inventory therefor.

B.     The Franchisee shall, at its sole expense, prepare, obtain, or cause to be prepared and/or obtained all requisite drawings, designs, site surveys, studies, plans, or plans, approvals, variances and permits.

C.     The Franchisee shall cause the Premises to be constructed in accordance with the Company's standard plans and specifications for the Premises, except as modified by the Franchisee, subject to the Company's approval, to the extent necessary to comply with applicable ordinances, building codes, permit requirements, lease requirements and restrictions, and market considerations.  Such modifications shall be at the Franchisee's expense.

D.     The Franchisee shall employ licensed contractors that meet the Company's specifications to perform all required construction of the Franchised Location.  If plans and specifications furnished by the Company for the Premises are modified by or for the Franchisee by any one other than the Company, the Franchisee shall submit final, detailed plans and specifications for the Company's prior written consent before remodeling or construction is commenced.  All remodeling and construction must be in strict conformance with plans and specifications furnished or approved by the Company.

15

DCS – FA
11/15/04

E.    The Franchisee shall commence construction or development as soon as possible after the date hereof and attend to its expeditious completion; purchase and pay for all materials and supplies; purchase, pay for and attend to the installation of all fixtures and equipment; train all employees; obtain all required insurance, permits and licenses and, in general, do all that is necessary for the Franchised Business to open for business no later than one (1) year after the date of this Agreement. If the Franchisee fails to open the Franchised Business within the time provided in this paragraph, and the Company elects to terminate this Agreement as provided herein, then, in addition to its other remedies, the Company shall have the right, but not the obligation, to purchase from the Franchisee any or all of the fixtures, equipment, and inventory for the Franchised Business. The Company shall pay the Franchisee for such fixtures, equipment, and inventory, the Franchisee's cost for such items. The Franchisee shall execute such documents as the Company deems necessary or appropriate to effect such purchase, and shall deliver all fixtures, equipment, and inventory, purchased, free and clear of any liens and claims. The Company shall be entitled to withhold from the purchase price an amount sufficient to discharge any such liens and claims.

8.3    Opening for Business.  The Franchisee shall give the Company at least thirty (30) days prior written notice of the opening of the Franchised Business to the general public ("Notice of Opening"). If such notice is not given the Company shall be relieved of its obligation to provide the assistance set forth in Sections 7.6 and 7.7 in connection with the opening of the Franchised Business. The Franchisee shall deliver to the Company an executed Notice of Opening, no later than the date the Franchised Business is opened.    At the time the Franchisee provides the Notice of Opening, the Franchisee shall also submit for the Company's prior approval a Grand Opening advertising and promotion program for the Franchised Business and shall, at the Franchisee's expense, implement such program during the Grand Opening.

8.4    Maintain Standards.  In order to protect the System and to maintain the uniform standards of operation under the franchise granted herein, the Franchisee shall operate the Franchised Business at all times in strict compliance with the requirements of this Agreement including the mandatory provisions of the manuals. If the Franchised Business is a Drop Station Store, all garments and other clothing must be serviced by a Dry Cleaning Station® Full Service Store to which the Franchisee has direct access.

8.5    Cooperate With Other Dry Cleaning Stations® Locations.  In the event of failure or break down of equipment at another Dry Cleaning Station® store, the Franchisee shall cooperate with such store owner by accepting business from such other store during such time the equipment is being repaired and shall charge such other store owner for such service a price not greater than the Franchisee's cost plus fifteen percent (15%). If the Franchisee is operating a Full Service Store or Plant Store, the Franchisee shall accept items to be cleaned from Drop Station Stores and may not terminate the relationship unless timely payments for services are not made. The fees for such services shall be negotiated between the Franchisee and each Drop Station Store or Plant Store.

16

DCS – FA
11/15/04

8.6    Maintain Appearance.  The Franchisee shall maintain the condition and appearance of the Premises consistent with the Company's standards and policies for the image of the Franchised Business, including replacement of worn out or obsolete equipment, fixtures, furniture and signs, repair of the exterior and interior of the Premises and redecorating as required by the Company from time to time.

If at any time, in the Company's sole and absolute judgment, the general state of repair or the appearance of the Premises of the Franchised Business or its equipment, fixtures, furniture, signs or decor does not meet the Company's standards the Company shall notify the Franchisee specifying the action to be taken by the Franchisee to correct such deficiency.  If the Franchisee fails or refuses to initiate a bona fide program to complete any required maintenance within thirty (30) days after receipt of such notice or to continue such maintenance until completed, the Company shall have the right, in addition to all other remedies, to enter upon the Premises of the Franchised Business and effect such required maintenance on behalf of the Franchisee.  The Franchisee shall pay the entire cost thereof on demand to the Company plus twenty-five percent (25%).

8.7    Alterations to Premises.  The Franchisee shall make no material alterations to the improvements of the Premises nor shall the Franchisee make material replacements of or alterations to the equipment, fixtures, furniture, or signs of the Premises without the prior approval of the Company.

8.8    Use of Premises.  The Franchise Location shall be used solely for the purpose of conducting a Franchised Business unless another use is specifically approved in writing by the Company.  Such written consent for any such other use must be obtained by the Franchisee not less frequently than every twelve (12) months.  If such permitted use is similar or related to the Franchised Business such business shall, at the Company's option exercised in its sole discretion, be deemed to be a new program, product and/or service added to the Franchised Business and any revenues from such business shall be included in the definition of Gross Revenues.  The Franchisee shall sell only those products and services authorized from time to time by the Company and will offer for sale all products and services prescribed by the Company.

8.9    Approved Suppliers.  The Franchisee will purchase, from either the Company, or vendors and suppliers which may include another Dry Cleaning Station[®] franchisee approved by the Company, or the Company or an affiliate of the Company, all equipment, supplies, and other products and services which the Company determines meet the standards of quality and uniformity required to protect the valuable goodwill and uniformity of the System and the Marks.  In addition to paying the cost of such items, the Franchisee shall pay all sales, use and value added taxes with respect to such items, and all applicable shipping charges.

The Company may, from time to time, provide Franchisee a list of approved suppliers of items used in the operation of the Franchised Business.  If provided, the Company will revise the approved supplier list from time to time in its sole discretion.  The approved source of supply for any individual item may be the Company, an affiliate of the

17

Company, or an independent contractor. The Franchisee shall not be restricted from using sources of supplies other than those previously approved by the Company if the other sources supply items of substantially the same quality and specifications as those supplied by the approved sources. To maintain quality standards in all Dry Cleaning Station® businesses, the Franchisee shall obtain the approval of the Company prior to the use of any supplier not previously approved by the Company, and as a pre-condition to the granting of such approval the Company may require the proposed supplier submit to the Company samples of items proposed to be provided to the Franchisee for use in the Franchised Business. The Company reserves the right to require the Franchisee to reimburse the Company for its time and costs in researching suppliers suggested by the Franchisee. If the Company develops proprietary software for use in the Franchised Business, the Franchisee will purchase such software from the Company or its designee.

The Company shall not be liable to the Franchisee for damages caused by: (i) supplies, signs, forms or advertising materials that do not comply with statutes, rules or regulations applicable to the Franchisee; or (ii) the failure of the Company or an approved or recommended supplier to make available for purchase any item, unless the failure is the result of factors within the Company's reasonable control.

8.10 Compliance with Laws. The Franchisee shall, at its expense, secure and maintain in force all required licenses, permits, and certificates relating to the operation of the Franchised Business and shall operate the Franchised Business in full compliance with all applicable local, state and federal laws, rules and regulations. The Franchisee agrees to refrain from any merchandising, advertising or promotional practice which is unethical or may be injurious to the business of the Company, other Dry Cleaning Station® stores or to the goodwill associated with the Marks.

8.11 Payment of Liabilities and Taxes. The Franchisee shall pay, when due, all of its obligations, liabilities and taxes to the Company, suppliers, lessors, creditors and taxing authorities. The Franchisee's failure to comply with this provision shall be a material breach of this Agreement.

8.12 Standardization. The Franchisee shall require its employees to wear such uniforms as may be designated by the Company from time to time and will comply with such programs of standardization as may from time to time be promulgated by the Company to promote the common business image and to protect the goodwill associated with the Company's Marks and System. The Franchised Business will be open for business for such minimum days and hours as the Company may from time to time designate.

8.13 Management. The Franchised Business shall be at all times under the direct, on-premises supervision of the Franchisee or a trained and competent employee acting as a full-time manager who shall have completed the Company's initial training program. The use of a manager by the Franchisee shall not relieve the Franchisee of its obligation to participate directly in the operation and management of the Franchised Business. If the Franchisee operates more than one Dry Cleaning Station® franchise, or

18

DCS – FA
11/15/04

if the Franchisee does not devote full-time to conducting the Franchised Business, at least one trained and competent employee shall act as a full-time manager at each Franchised Location. The Franchisee shall keep the Company informed at all times of the identity of any employee acting as manager of the Franchised Business. The Company shall make training available, as is reasonably necessary, for all managers designated by the Franchisee. The Franchisee will at all times faithfully, honestly and diligently perform the obligations hereunder and will not engage in any business or other activity that will conflict with the obligations hereunder.

8.14 <u>Unauthorized Activities</u>. The Franchisee shall not install or maintain on the Premises of the Franchised Business any telephone booths, newspaper racks, video games, juke boxes, gum machines, games, rides, vending machines or other similar devices without the prior approval of the Company.

8.15 <u>Notice to the Company</u>. The Franchisee shall notify the Company in writing within five (5) days of the commencement of any action, suit, or proceeding and the issuance of any order, writ, injunction, award or decree of any court, agency or other governmental instrumentality affecting the operation or financial condition of the Franchised Business or the Franchisee.

## ARTICLE IX.
## TRADEMARKS

9.1 <u>Ownership</u>. The Franchisee acknowledges the validity of the Marks and that they are the sole property of the Company. The Franchisee's right to use the Marks is derived solely from this Agreement and is limited to the conduct of the Franchised Business by the Franchisee pursuant to and in compliance with this Agreement and all applicable standards, specifications and operating procedures prescribed by the Company from time to time. Any unauthorized use of the Marks by the Franchisee is a breach of this Agreement and an infringement of the rights of the Company. All usage of the Marks by the Franchisee and any goodwill established by the Franchisee's use of the Marks shall inure to the exclusive benefit of the Company. All provisions of this Agreement applicable to the Marks apply to any additional trademarks, service marks, and commercial symbols hereafter authorized for use by and licensed to the Franchisee by the Company. Franchisee shall not at any time challenge the Marks, or the Company's ownership of or right to use or license the Marks.

9.2 <u>Use</u>. The Franchisee shall operate under, and prominently display, the Marks in the operation of the Franchised Business in the manner designated by the Company. The Franchisee shall not use the Marks as part of any corporate or trade name, or within any prefix, suffix, or other modifying words, terms, designs, or symbols, or in any modified form, nor may the Franchisee use the Marks in connection with the sale of any unauthorized product or service or in any other manner not expressly authorized by the Company. The Franchisee shall give such notice of trademark and service mark registration as the Company specifies and obtain such fictitious or assumed name registrations as may be required under applicable law. The non-exclusive personal right

19

DCS – FA
11/15/04

of the Franchisee to use the Marks in connection with the Franchised Business and its right to use the Marks and the System apply only to the Franchised Location and only so long as the Franchisee shall fully perform and comply with all of the conditions, terms and covenants of this Agreement. If, in the sole and absolute judgment of the Company, the acts of the Franchisee infringe upon or demean the goodwill, standards of uniformity or quality, or business standing associated with the Marks and the System, then the Franchisee shall immediately, upon notice from the Company, modify its use of the Marks and the System in the manner prescribed by the Company. The Franchisee shall not, during or after the term of this Agreement, do anything directly or indirectly which would infringe upon, harm, mislead or contest the rights of the Company in the Marks or the System.

9.3    Infringement. The Franchisee shall immediately notify the Company of any apparent infringement of or challenge to the Franchisee's use of any present or future Marks and of any claim by any person of any rights in the Marks or in any similar trade name, trademark, service mark or logo of which Franchisee becomes aware. The Franchisee shall not directly or indirectly communicate with any person other than the Company and its counsel in connection with any such infringement, challenge or claim. The Company shall have sole discretion and exclusive right to take such action as it deems appropriate to control any litigation, U.S. Patent and Trademark Office proceeding or other administrative proceeding arising out of such infringement, challenge or claim or otherwise relating to the Marks. The Franchisee shall execute any and all instruments and documents, render such assistance, and do such acts and things as may, in the opinion of the Company, be necessary or advisable to protect and maintain the interests of the Company in any such litigation, or administrative proceeding, or to otherwise protect and maintain the interest of the Company in the Marks.

9.4    Substitutions. If there is a claim by any party that its right to any use of the Marks are superior and if the Company determines that such claim is legally meritorious or if the Company determines, in its sole and absolute discretion, that it is advisable for the Company and/or the Franchisee to modify or discontinue use of any of the Marks, and/or use one or more additional or substitute Marks, then upon notice from Company Franchisee, at its expense, will immediately make such changes and amendments to the Marks as may be required by the Company.

## ARTICLE X.
## FEES

10.1    Initial Franchise Fee. The Franchisee shall pay to the Company the Initial Franchise Fee upon the execution of this Agreement. Except as provided herein, the Initial Franchise Fee shall be non-refundable. The Initial Franchise Fee shall be fully earned by Company when paid.

10.2    Royalty Fee. In addition to the Initial Franchise Fee, the Franchisee shall pay to the Company, without offset, credit, or deduction of any kind, the monthly Royalty Fee on Gross Revenues of the Franchised Business in the immediately preceding month.

20

The monthly Royalty Fee commences as soon as the Franchisee opens the Franchised Business.

10.3    Advertising Fees.    If the Company establishes a Local Cooperative Advertising Fund or National Advertising Fund, the Franchisee shall pay to the Company, without offset, credit, or deduction of any kind, the Local Advertising Requirement and National Advertising Fee from and after the date that the Company shall establish a Local Cooperative and/or National Advertising Fund.

10.4    Payment.    On or before the tenth (10th) day of each month, the Franchisee shall submit to the Company on a form prescribed by the Company, a correct statement, signed by the Franchisee, of the Franchisee's Gross Revenues for the immediately preceding month. Each monthly statement of Gross Revenues shall be accompanied by the Royalty Fee and National Advertising Fees, if any, based upon the Gross Revenues reported in the statement so submitted. Any unpaid Royalty Fee, or National Advertising Fees due to Company shall bear interest at the lesser of the maximum legal rate allowable in the state in which the Franchised Business is located or eighteen percent (18%) simple interest per annum. This Section shall not constitute an agreement by the Company to accept such payments after the same are due or a commitment by the Company to extend credit to, or otherwise finance the Franchisee's operation of the Franchised Business. Failure to pay all amounts when due shall constitute grounds for termination of this Agreement notwithstanding the provisions of this Section. Notwithstanding any designation by the Franchisee, the Company shall have the sole and absolute discretion to apply in any manner any payments by the Franchisee to any past due indebtedness of the Franchisee.

## ARTICLE XI.
## ADVERTISING AND PROMOTION

11.1    Local Advertising.

A.    The Franchisee agrees to spend not less than the Local Advertising Requirement on local advertising and promotional programs approved in writing or established by the Company. On or before the tenth (10th) day of each month, the Franchisee shall submit to the Company on a form prescribed by the Company advertising reports, and paid receipts of its local advertising and promotional program expenditures in the prior month. To promote the Franchised Business, the Franchisee shall expend the Local Advertising Requirement for local direct mail, telephone marketing and display advertising, as specified in the Company's manuals. In addition to any other rights of the Company hereunder, if the Franchisee fails to expend the Local Advertising Requirement in any given month under this Section 11.1(A), the Franchisee shall pay to the Company within ten (10) days of an invoice therefore, the difference between the amount the Franchisee was required to spend and the amount actually spent by the Franchisee. Unpaid amounts shall bear interest at the same rate set forth in Section 10.4 above.

21

DCS – FA
11/15/04

The Franchisee will submit to the Company or its designated advertising agency, for its prior approval, the identity of any advertising agency selected by the Franchisee to prepare advertising and promotional materials, and an exact copy of all promotional materials and advertising to be used by the Franchisee. The Franchisee shall not engage an advertising agency or use any advertising or promotional materials and shall refrain from publishing or distributing such materials, unless and until the Company approves the advertising agency and the materials. The Company's approval is not an endorsement or assurance of a likelihood of success but only an indication that the materials and/or the advertising agency meet the Company's minimum standards. Any approvals of an advertising agency or advertising materials by the Company may be revoked upon thirty (30) days notice to the Franchisee. In connection with obtaining the approval of an advertising agency, the Franchisee shall provide the Company with all information reasonably requested by the Company. All promotional and advertising materials submitted to the Company shall become the property of the Company.

B.    In order to facilitate such advertising, the Company may establish Local Cooperative Advertising Funds. In connection with the establishment of a Fund, the Company may designate an Advertising Group in an Advertising Area for the purposes of developing cooperative, local or regional advertising and promotional programs. Each Dry Cleaning Station® store located in the Advertising Area shall have one (1) vote and the majority of all votes of the Advertising Group shall approve programs and the payment of the costs thereof. The Franchisee shall participate in the Advertising Group and contribute up to the Local Advertising Requirement into the Local Advertising Fund to pay for such cooperative advertising and promotional programs. The cost of such programs shall be allocated among the members of the Advertising Group in proportion to each member's Gross Revenue during the preceding twelve (12) month period, or portion thereof; provided, however, the maximum required contribution by the Franchisee during any twelve (12) month period shall be the amount approved by a majority of the members of the Advertising Group, but in no event shall exceed one percent (1%) of the Franchisee's monthly Gross Revenues during each month in such period. If necessary, the Company shall serve as an arbitrator to resolve irreconcilable differences among members of the Advertising Group with respect to matters concerning a Local Cooperative Advertising Fund. The Company's decision, exercised in its sole and absolute discretion, shall be binding on all members of the Advertising Group. Contributions by the Franchisee to the Local Cooperative Advertising Fund will be credited toward the Franchisee's Local Advertising Requirement on a dollar-for-dollar basis. If the Franchisee's contributions in any month to the Local Cooperative Advertising Fund fail to equal the Local Advertising Requirement, the Franchisee shall be required to spend in the immediately following month, the difference between such amounts plus the Local Advertising Requirement for that month. If the Franchisee fails to expend such amount in such month, the Franchisee shall pay to the Company the difference between the amount the Franchisee was required to spend and the amount actually spent by the Franchisee within 10 days of an invoice, therefore. Unpaid amounts shall bear interest at the same rate set forth in Section 10.4 above.

22

DCS – FA
11/15/04

A Local Cooperative Advertising Fund shall not be an asset of the Company. The Company may, but it is not obligated to, make loans to a Local Cooperative Advertising Fund bearing reasonable interest to cover any deficits of a Local Cooperative Advertising Fund and cause the Fund to invest any surplus for future use by the Local Cooperative Advertising Fund. No part of a Local Cooperative Advertising Fund shall be used by the Company to defray any of its general operating expenses other than those reasonably allocable to local marketing advertising which includes, but is not limited to, the costs of local direct mail, telemarketing and display advertising and reasonable salaries and expenses, as the Company may incur in activities reasonably related to the establishment or direction of the Local Cooperative Advertising Fund.

C.    The Advertising Group will be subject to the same requirements as the Franchisee with respect to engaging an advertising agency and using promotional or other advertising materials and the Company shall have the same rights of approval with respect thereto. The submission of advertising to the Company for approval shall not affect the Franchisee's right to determine the prices at which the Franchisee sells its products or services. The Company may change, merge or dissolve any or all Local Cooperative Advertising Funds.

### 11.2    National Advertising.

A.    The Company may establish and administer a National Advertising Fund ("the Fund") at such time as there are more than two hundred (200) Dry Cleaning Station® stores (including franchised stores and stores owned by the Company or its affiliates) open. If the number of Dry Cleaning Station® stores falls below two hundred (200) after the Fund is established, the Company will have the sole right to continue, modify or discontinue the Fund. The Company shall notify the Franchise when the Fund is established and the dates on which the payment of the Franchisee's first and subsequent National Advertising Fee shall be due. The National Advertising Fund is not, and shall not be, an asset of the Company. The Company may, but is not obligated to, make loans to the National Advertising Fund bearing reasonable interest to cover any deficits of the National Advertising Fund and cause the National Advertising Fund to invest any surplus for future use by the National Advertising Fund.

Losses sustained or gains accrued in the National Advertising Fund at the end of the Company's fiscal year shall carry over to subsequent fiscal years. There shall be no requirement that all or any part of the Fund be disbursed within any fiscal year. All interest, if any, earned by the Fund shall be used for the payment of expenses of the Fund before application of any principal to those expenses. If requested by the Franchisee, the Company shall provide the Franchisee an annual statement of the financial condition of the Fund, certified by an officer of the Company. The Company may change, merge or dissolve the National Advertising Fund.

B.    Methods of advertising, selection of media, locale of advertising, and contents, terms and conditions of advertising campaigns and promotional programs shall be within the sole and absolute discretion of the Company. While the Company may from

23

DCS – FA
11/15/04

time to time petition its franchisees, individually or as an advisory group, for input on expenditures from the advertising fund, and may agree from time to time to be bound by the decisions of an advisory group of franchisees, the Company shall not be bound to solicit such input, or be bound by decisions of such groups.

C.      Such advertising is intended to maximize the public's awareness of the Marks and the System, and the Company, accordingly, undertakes no obligation to insure that any individual franchisee benefits directly or on a pro rata basis from the placement. No part of the National Advertising Fund shall be used by the Company to defray any of its general operating expenses other than those reasonably allocable to the Fund which includes but is not limited to the cost of maintaining, administering, directing, placing and preparing national advertising materials, programs and public relations activities, the cost of employing advertising agencies and public relation's firms to assist therewith, research and development and reasonable salaries and expenses as the Company may incur in activities reasonably related to the administration or direction of the Fund and its advertising programs and to defray the cost to the Company of maintaining and updating its website.

## ARTICLE XII.
## RELATIONSHIP OF PARTIES/INDEMNIFICATION

12.1    Relationship of the Parties. This Agreement does not create a fiduciary relationship between the parties. The Company and the Franchisee shall be independent contractors. Nothing in this Agreement is intended to make either party a general or special agent, joint venturer, partner or employee of the other for any purpose. The Franchisee shall conspicuously identify itself in all dealings with customers, suppliers, public officials and others as the owner of the Franchised Business under a franchise with the Company and shall place such other notices of independent ownership on the Premises, forms, business cards, stationary, advertising and other materials as the Company may require from time to time. The Franchisee shall not represent or imply to any person that this Agreement authorizes the Franchisee to act as an agent for the Company.

12.2    No Liability of Act of the Other. Neither the Company nor the Franchisee shall make any express or implied agreements, warranties, guarantees or representations, or incur any debt, in the name of or on behalf of the other, or represent that their relationship is other than franchisor and franchisee and neither the Company nor the Franchisee shall be obligated by or have any liability under any agreements or for any representations made by the other. The Company shall not be obligated for any damages to any person or party, directly or indirectly, arising out of the operation of the Franchised Business or the Franchisee's business conducted hereunder, breach of contract, or caused by the Franchisee's negligent or willful action or failure to act. The Company shall have no liability for any sales, use, occupation, excise, gross receipts, income, property or other taxes, whether levied upon the Franchisee, the Franchised Business, or the Franchisee's property, or upon the Company, in connection with sales

24

DCS – FA
11/15/04

made or business conducted by the Franchisee or payments to the Company pursuant hereto.

12.3    Indemnification by the Franchisee.   The Franchisee shall indemnify and hold the Company, its stockholders, directors, officers, employees, agents and assignees harmless against any liability for claims arising out of the operation of the Franchised Business or the sale, transfer or assignment by the Franchisee of the Franchisee's interest in this Agreement or the Franchised Business. For purposes of this Section 12.3 and Section 12.4, "claims" means and includes, without limitation, all fines, suits, proceeding, investigative or inquiry (formal or informal) demands or actions of any kind or nature including taxes, instituted by any third party, arising or growing out of or otherwise connected with the Franchisee's operation of the Franchised Business or payments to the Company pursuant to this Agreement, actual and consequential damages, and costs reasonably incurred in the defense of any claim against the Company such as accountants, attorneys and expert witness fees, costs of investigation and proof of facts, court costs, other litigation expenses and travel and living expenses. For purposes of this paragraph, liability shall include without limitation reasonable attorneys' fees, costs of investigation or proof of facts, court costs, other litigation expenses and travel and living expenses, and from all amounts paid or incurred by the Company arising out of a claim. The Company shall have the right to defend any such claim against it.   Such an undertaking by the Company shall, in no manner or form, diminish the Franchisee's obligation to indemnify the Company and to hold it harmless. The Company shall not be required or obligated to seek recovery from third parties or otherwise mitigate its losses in order to maintain a claim against the Franchisee. If a decision rendered in an action or suit covered by this paragraph is against the Franchisee or the Company, and the Company desires to appeal the decision, the Franchisee may notify the Company within ten (10) days of the date of the decision of its intent to abide by the decision, then, in such event, the Franchisee shall pay the Company the amount required of it under this paragraph, and all future costs related to the appeal and/or settlement of the claim shall be the responsibility of the Company.

12.4    Indemnification by the Company.   The Company agrees to indemnify the Franchisee against and to reimburse the Franchisee for any obligations or liability for damages payable to persons other than the Franchisee or its owners, attributable to false representations, or warranties of the Company, or caused by the negligence or willful action of the Company, and for costs reasonably incurred by the Franchisee in the defense of any such claim or any action arising therefrom in which it is named as party, provided that the Company shall have the right to participate in and to control any such litigation or proceeding. The indemnities and assumptions of liabilities and obligations set forth in this Agreement shall continue in full force and effect subsequent to, and notwithstanding the expiration, termination or assignment of, this Agreement.

25

DCS – FA
11/15/04

## ARTICLE XIII.
## INSURANCE

13.1   Required Insurance.  The Franchisee shall purchase and, at all times during the Term or the term of any Successor Agreement, maintain policies of insurance with such minimum standards, coverages and limits, or such additional limits or types of coverage as Company may from time to time prescribe in the manuals but, in no event, less than One Million Dollars ($1,000,000) broad form comprehensive liability coverage and broad form products and contractual liability coverages with no more than a Five Thousand Dollar ($5,000) deductible.   The Company may periodically increase the amounts of coverage required under such insurance policies and require different or additional kinds of insurance to reflect inflation, identification of new risks, changes in law or standards of liability, higher damage awards, or other relevant changes in circumstances.    Such insurance policies shall be written by insurance companies satisfactory to the Company in accordance with the standards and specifications set forth in the manuals and shall insure the Franchisee and the Company and shall require the insurer to defend both the Franchisee and the Company in any action and provide for thirty (30) days prior written notice to the Company of any material modification, cancellation or expiration of a policy.  The Franchisee shall provide evidence satisfactory to the Company that such insurance is in full force and effect prior to commencing the Franchised Business at any time as requested by the Company.

13.2   Failure to Insure.  If the Franchisee fails or refuses to maintain required insurance coverage, or furnish satisfactory evidence thereof, the Company, at its option, and in addition to its other rights and remedies hereunder, obtain such insurance coverage on behalf of the Franchisee and the Franchisee shall fully cooperate with the Company in its efforts to obtain and maintain such insurance policies, promptly execute all forms or instruments required to obtain any such insurance, allow any inspections of the Franchised Business which are required to obtain or maintain such insurance and pay to the Company, on demand, any costs and premiums incurred by the Company.

13.3   Company's Insurance.  The Franchisee's obligation to obtain and maintain insurance as herein described shall not be relieved or affected in any manner by any separate insurance maintained by the Company.

## ARTICLE XIV.
## REPORTS, FINANCIAL STATEMENTS, AND AUDIT RIGHTS

14.1   Books and Records.  The Franchisee shall establish and maintain at the Franchisee's expense a bookkeeping, accounting and record keeping system conforming to the requirements prescribed by the Company from time to time.  With respect to the operation and financial condition of the Franchised Business, the Franchisee shall sign, verify the accuracy and truthfulness, and furnish the following reports, financial statements, and returns, to the Company in the form prescribed by the Company:

26

DCS – FA
11/15/04

A.      On or before each Friday a report of the Gross Revenues of the Franchised Business for the week ending the preceding Sunday and such other data, information and supporting records as the Company may require;

B.      Within ten (10) days after the end of each month, a report of the Gross Revenues of the Franchised Business for the immediately preceding month and such other data, information and supporting records as the Company may require.

C.      Within fourteen (14) days after the end of each quarterly period following the opening of the Franchised Business during the first full calendar year of operation, a profit and loss statement, and a balance sheet and a report of the Franchisee's expenditures of the Local Advertising Requirements and promotions together with receipts evidencing such expenditures;

D.      Within sixty (60) days after the end of the Franchisee's fiscal year a profit and loss statement and balance sheet for the preceding fiscal year reflecting all year-end adjustments for the Franchised Business; and

E.      Within ten (10) days after their filing, copies of all state and local sales, use and service tax returns, state financial reports, and the portions of the Franchisee's federal and state income tax returns that reflect the operations of the Franchised Business.

14.2    Records of Gross Revenues - Computer/Cash Register.  The Franchisee shall record Gross Revenues on a computer/cash register software package as required by the Company.  The Company shall have the right to change the make, model or specifications of the computer/cash register software package from time to time upon reasonable notice to Franchisee.

14.3    Audit of Books and Records.  All records shall be kept for a period of at least three (3) years following the end of each calendar year.  The Company shall have the right to audit or cause to be inspected, audited and copied, from time to time, the affairs and records relating to the operations of the Franchised Business or, if the Franchisee is a limited liability company, corporation or partnership, the owners, members or partners of the Franchisee (provided the Company shall only have the right to audit the tax returns of the owners, members or partners of the Franchisee if the Company's investigation of the books, statements and other records of the Franchisee discloses errors in reported Gross Revenues of Franchisee).  Upon request by the Company, the Franchisee shall make such books, records and information available to the Company or its designated representative at all reasonable times for review and audit by the Company at the Franchised Location.  In the event that an audit discloses an understatement of the Gross Revenues of the Franchised Business for any period or periods, Franchisee, within ten (10) days of receipt of the audit report, shall pay to the Company the Local/National Advertising Requirement/Fees, and Royalty Fees, if any, due on the previously underreported Gross Revenues, plus interest from the due date at the maximum rate permitted by law, not to exceed eighteen percent (18%) simple interest per annum, and in

27

DCS – FA
11/15/04

the event such understatement is more than two percent (2%) of the Gross Revenues for the period, the Franchisee shall also reimburse the Company for the cost of the audit, including, without limitation, the charges of any independent accountant and the travel expenses, room and board, and compensation of persons employed by the Company to make the audit. In addition to the foregoing, if the understatement for any period is more than ten percent (10%) of the Gross Revenues of the Franchised Business for the period, the Franchisee shall immediately pay to the Company an amount equal to three (3) times the Royalty Fee and/or Local/National Advertising Requirement/Fees, if any shown to be due. Reimbursement to the Company for the cost of the audit shall be made upon the receipt of an invoice therefor. Such costs not reimbursed within ten (10) days of receipt of an invoice shall bear interest from the due date at the maximum rate permitted by law, not to exceed eighteen percent (18%) simple interest per annum.

## ARTICLE XV.
## TRANSFER OF FRANCHISE

15.1    <u>By the Company</u>.    This Agreement may be assigned or otherwise transferred by the Company without notice to the Franchisee and, if so assigned or transferred, shall inure to the benefit of the Company's successors and assigns.

15.2    <u>By the Franchisee</u>. No Franchisee, partner (if the Franchisee assigns this Agreement to a partnership), shareholder (if the Franchisee assigns this Agreement to a corporation), or member (if the Franchisee assigns this Agreement to a limited liability company) without the prior written consent of the Company, by operation of law or otherwise, shall sell, assign, transfer, convey, give away or encumber to any person, company or partnership or other legal entity, its interest in this Agreement or its interest in the franchise granted hereby, any interest in the Franchised Business or its interest in a proprietorship, partnership, limited liability company or corporation which owns any interest in the Franchised Business. Any purported assignment not having the necessary consent shall be null and void and shall constitute a material default hereunder.

A.    The Franchisee may assign and transfer its rights hereunder to a corporation, limited liability company or partnership without, however, being relieved of any personal liability, provided:

(1)    The corporation, company or partnership is newly organized and its activities are confined exclusively to operating Franchisee's Franchised Business;

(2)    The Franchisee is the owner of more than fifty percent (50%) of the equity interest of the entity and is the principal executive officer thereof;

(3)    All money obligations of the Franchisee to the Company are fully paid;

(4)    The corporation, company or partnership agrees, in a writing satisfactory to the Company, to assume all the Franchisee's obligations hereunder;

28

DCS – FA
11/15/04

(5)    All stockholders, members or partners of the entity guarantee, in a writing satisfactory to the Company, the full and prompt payment and performance by the entity of all its obligations to the Company;

(6)    Each stock, membership or partnership certificate of the entity shall have conspicuously endorsed upon it a statement that it is held subject to, and that further assignment or transfer thereof is subject to, all restrictions imposed upon assignments by this Agreement; and

(7)    No new shares of equity in the corporation or company or interests in the partnership, shall be issued to any person, partnership, trust, foundation, or corporation without obtaining the Company's prior written consent and then only upon disclosure of the terms and conditions contained herein being made to the prospective new holders of the equity or other interest.

B.    The Company shall not unreasonably withhold its consent to any assignment of less than one-half (1/2) of the beneficial voting interest in the franchise or the Franchised Business, provided such transfer is not part of a series of transfers intended to evade this provision, and further provided:

(1)    The transferee shall enter into a written agreement with the Company, in a form satisfactory to the Company, assuming and/or guaranteeing all of the Franchisee's obligations hereunder;

(2)    Any defaults under this Agreement or the Successor Agreement on the part of the Franchisee have been remedied;

(3)    Such other reasonable conditions as may be required by the Company in connection with a transfer have been satisfied; and

(4)    The Franchisee executes a general release of all claims (to the extent allowed by law) the Franchisee may have against the Company, its directors, officers, shareholders and employees, in both their corporate and individual capacities.

C.    If an assignment, alone or together with other previous, simultaneous, or proposed assignments, would have the effect of transferring one-half (1/2) or more of the beneficial or voting interest in the franchise, the Franchised Business, or the operation of the Franchised Business, the Company will not unreasonably withhold its consent to the assignment if all the following conditions and requirements have been satisfied:

(1)    The transferee shall be of good moral character and reputation, shall have a good credit rating, financial capabilities, and shall have the aptitude, skills and qualifications in the Company's sole and absolute judgment, to conduct the Franchised Business and to fulfill the transferor's obligations to the Company. The Franchisee shall provide the Company with the information it may reasonably require to make a determination concerning the proposed transferee;

29

(2)    The transferee or proposed representative of the assignee approved by the Company to manage the Franchised Business must satisfactorily complete the Company's training program (and pay to the Company its then current training fee) before the transferee may assume responsibility for the operation of the Franchised Business;

(3)    The Franchisee shall have fully paid and satisfied all the Franchisee's obligations to the Company, and the Franchisee shall have paid to the Company the Transfer Fee;

(4)    If the transferee is a corporation, limited liability company or partnership, all shareholders, members or partners of the transferee shall enter into a written agreement, in a form satisfactory to the Company, jointly and severally guaranteeing the full payment and performance of the transferee's obligations to the Company and agreeing to be personally bound by all covenants and restrictions imposed upon the transferee under the terms of this Agreement or the new Franchise Agreement;

(5)    The Franchisee shall have executed a general release of all claims (to the extent allowed by law) the Franchisee may have against the Company, its directors, officers, shareholders, and employees, in both their corporate and individual capacities;

(6)    The transferee shall provide the Company with proof of insurance in types and amounts meeting the requirements of this Agreement or the franchise agreement signed by the transferee, including naming the Company as an additional insured;

(7)    If the Franchisee and/or the Franchisee's owners finance any portion of the purchase price, such persons must execute a subordination agreement, in form reasonably required by the Company, agreeing to subordinate the transferee's obligations to such persons to the obligations of the transferee to the Company;

(8)    The transferee assumes all of the obligations of the Franchisee under the lease, if any, for the Premises and the Franchisee shall not be in default with respect to any of its obligations under said lease;

(9)    The transferee executes the Company's then-current form of franchise agreement and ancillary documents including personal guarantys (except that the transferee shall not be obligated to pay an initial franchise fee), the term of which shall expire on the date provided herein for the expiration of this Agreement. If the Franchisee shall have obtained two Successor Agreements prior to the time of the transfer, the franchise agreement executed by the transferee shall not contain the right to obtain a Successor Agreement.

(10)   The Franchisee shall provide the Company with such information as the Company shall require to make such evaluations of the proposed transferee as it shall deem necessary to satisfy its requirements;

30

DCS – FA
11/15/04

(11)   The Franchisee shall have first offered to sell, transfer, lease or assign this Agreement and the Franchised Business to the Company in accordance with Article XVI; and

(12)   Any advertisement for sale of the Franchisee's rights hereunder shall make clear that the Franchisee and not the Company is the offeror.

15.3   Death.  The transfer of the Franchisee's interest in this Agreement and in the Franchised Business to the Franchisee's heirs, personal representatives or conservators, as applicable, in the event of death or legal incapacity of the Franchisee, (and if the Franchisee is a partnership, limited liability company or corporation, the death or incapacity of any one individual controlling one-half (1/2) or more of the voting or beneficial interest of the Franchisee) shall not constitute an assignment or transfer and shall not give rise to the Company's right of first refusal as provided herein, provided that the heirs, personal representatives or conservators, as applicable, meet the Company's standards for new franchisees, agree to execute the then-current form of franchise agreement (as amended by provisions similar to those imposed upon other assignees), and ancillary documents including personal guarantys, and, within sixty (60) days after the death of the Franchisee, a person designated by the Franchisee's heirs, personal representative or conservator, as applicable, shall have satisfactorily completed the Company's then current initial training program.   If at the time of such death the Franchisee has employed a manager who has satisfactorily completed such a training program, such manager shall be deemed to have satisfied such training requirements.

15.4   Subfranchising.  The Franchisee may not subfranchise or otherwise attempt to assign or transfer a portion, but not all, of its rights under or pursuant to this Agreement.

15.5   Compliance with Disclosure Laws.  The Franchisee shall give the Company thirty (30) days prior notice of any assignment by the Franchisee so as to enable the Company to comply with applicable state or federal disclosure laws or regulations, if any, pertaining to disclosures required in connection with any such sale or assignment.

15.6   No Encumbrance.  The Franchisee shall have no right to pledge, encumber, hypothecate, or otherwise give any third party a security interest in its rights under this Agreement in any manner whatsoever without the prior consent of the Company, which consent may be withheld for any reason whatsoever in the Company's sole, subjective judgment.

## ARTICLE XVI.
## RIGHT OF FIRST REFUSAL

16.1   Procedure Regarding Right of First Refusal.  If, at any time during the franchise relationship, the Franchisee receives a bona fide offer to purchase the franchise or the Franchised Business (the "Proposed Sale"), which offer the Franchisee is willing to

31

accept, the Franchisee shall communicate in writing to the Company the full terms of the offer and name of the offeror (the "Sale Notice").

16.2    Right of First Refusal.  Within fifteen (15) days after the Company's receipt of the Sale Notice or if it shall reasonably request additional information, within thirty (30) days after receipt of such additional information (the "Review Period"), the Company shall have the right at its sole option, to elect to purchase the Franchised Business itself or by its nominee, upon the terms and conditions specified in the Sale Notice by delivering a notice of its election to the Franchisee; provided, however, the Company shall have the right to substitute equivalent cash for any non-cash consideration included in the bona fide offer to purchase and the Company and the Franchisee will use their best efforts to complete the purchase within sixty (60) days from the date of the end of the Review Period.  The failure of the Company to deliver such notice within the time period shall constitute a waiver of its Right of First Refusal.

16.3    Company Objections/Conditions to Sale.  If the Company does not exercise its said Right of First Refusal, it shall have the right, but not the obligation, to deliver to the Franchisee, no later than the expiration of the Review Period, written notice of any objection it has, or any conditions it will impose upon, the Proposed Sale.  The failure of the Company to deliver such notice within said time period shall constitute a consent to the Proposed Sale, subject to the provisions relating to assignment.

16.4    Change in Terms/Conditions of Sale.  If the Company does not exercise its Right of First Refusal, and does not object to the Proposed Sale, the Franchisee shall have the right, for a period of thirty (30) days after the expiration of the Review Period, to close the Proposed Sale to the proposed transferee upon the terms and conditions specified in the Sale Notice subject to such conditions as the Company may have reasonably imposed thereon and subject to the provisions of this Agreement relating to assignment.    However, if the terms of the Proposed Sale are materially changed thereafter, such change terms shall be deemed a new offer and the Company shall again have such Right of First Refusal with respect to them.

16.5    Failure of Sale - New Right of First Refusal.  If the Proposed Sale fails to close within thirty (30) days after the expiration of the Review Period, then the offer shall be deemed a new offer with respect to which the Company shall have the Right of First Refusal.

## ARTICLE XVII.
## DEFAULT & TERMINATION.

### 17.1    Pre-termination Options of the Company.

A.    Prior to the termination of this Agreement, if the Franchisee fails to pay any amounts owed to the Company or its affiliates, or fails to comply with any term of this Agreement, then in addition to any other right the Company may have, including, but not

32

DCS – FA
11/15/04

limited to, the right to terminate this Agreement or to bring a claim for damages, the Company shall also have the option:

(1)    To suspend the listing of the Franchised Business from any advertising, promotions, website or listing sponsored or distributed by the Company, including such items as may be paid for in whole or part by a Local Cooperative Advertising Fund or the National Advertising Fund;

(2)    To suspend all services provided to the Franchisee under this Agreement or otherwise, including, but not limited to, training, marketing assistance, and the sale of marketing materials and other products and supplies;

(3)    To suspend the Franchisee's right to participate in National Accounts, and so long as such failure continues, to offer other Dry Cleaning Station® stores the opportunity to service the locations of any National Accounts in the Protected Area; and

(4)    To suspend the Franchisee's access to any portions of the Company's website, if any, not available to the general public.

B.    The Company's actions as outlined in Section 17.1.A. may continue until the Franchisee has brought its accounts current, cured any default, and complied with the Company's requirements, and the Company has acknowledged the same in writing. The taking of any of the actions permitted in Section 17.1.A. shall not suspend or release the Franchisee from any obligation that would otherwise be owed to the Company or its affiliates under the terms of this Agreement or otherwise. The Franchisee acknowledges that such actions would not impair the Franchisee's ability to continue in business and will not constitute a construction termination of this Agreement.

17.2    <u>The Company's Right to Terminate.</u>

A.    <u>Termination Without Right to Cure</u>.  The Company may terminate this Agreement immediately upon receipt by the Franchisee of notice of termination to the Franchisee, without any right of cure, if:

(1)    The Franchisee voluntarily abandons the franchise by failing to operate the Franchised Business for five (5) consecutive days, during which the Franchisee is required to operate the business under the terms of this Agreement, or any shorter period after which it is not unreasonable under the facts and circumstances for the Company to conclude that the Franchisee does not intend to continue to operate the franchise, unless such failure to operate is due to fire, flood, earthquake or similar causes beyond Franchisee's control;

(2)    The Franchisee fails to cure a default under this Agreement which materially impairs the good will associated with the Marks after the Franchisee has received written notice to cure at least twenty-four (24) hours in advance of termination;

33

(3)    The Franchisee repeatedly fails to comply with one or more of the requirements hereof or in another agreement between the Company and the Franchisee, whether or not corrected after notice;

(4)    The Franchised Business or the Premises are seized, taken over or foreclosed by a government official in the exercise of his duties, or seized, taken over or foreclosed by a creditor, lienholder or lessor, provided that a final judgment against the Franchisee remains unsatisfied for thirty (30) days (unless a supersedeas or other appeal bond has been filed); or a levy of execution has been made upon the licenses granted hereunder or upon any property used in the Franchised Business, and is not discharged within five (5) days of such levy;

(5)    The Franchisee or any of its managers, directors, officers or majority stockholder are convicted of, or plead guilty to or no contest to a felony or other criminal misconduct which is directly related to the operation of the Franchised Business;

(6)    The Company makes a reasonable determination that the continued operation of the Franchised Business by the Franchisee will result in imminent danger to public health or safety;

(7)    The Franchisee submits to the Company two (2) or more sales reports, financial statements, other information, or supporting records in any period of twelve (12) consecutive months which understates by two percent (2%) or more the Gross Revenues of the Franchised Business, or materially distorts any other material information

(8)    Within one hundred eighty (180) days after the date of this Agreement, the Franchisee or its manager has failed to complete, to the Company's satisfaction, the initial training program as required herein or within one (1) year from the date of this Agreement the Franchised Business is not open for business to the general public;

(9)    Any financial, personal or other information provided by the Franchisee to the Company in connection with the Franchisee's application for the franchise is materially false, misleading, incomplete or inaccurate; or

(10)    The Franchisee has failed to obtain the Franchisor's approval of a location for the Franchised Business within one hundred eighty (180) days after the date of this Agreement.

If the Company elects to terminate this Agreement based upon the Franchisee's failure to comply with Section 17.2.A.(8), the Company shall refund the Initial Franchisee Fee previously paid by the Franchisee to the Company less an amount equal to Twelve Thousand Five Hundred Dollars ($12,500) plus any out-of-pocket expenses incurred by the Company related to the franchise granted hereunder. If at the time of such termination, the Franchisee has entered into a binding lease or purchase agreement for the Premises or has entered into binding purchase orders for the purchase of equipment or fixtures to be installed in the Premises, the Company shall have the right but not the

34

obligation to require the Franchisee to assign its rights under the lease, purchase agreements and purchase orders to the Company. If the Company exercises its option, the Company shall assume all of the Franchisee's obligations under such assigned leases, purchase agreements and purchase orders.

B.    Termination With Opportunity to Cure.  The Company may terminate this Agreement immediately upon receipt by the Franchisee of notice of termination to the Franchisee, if the Franchisee commits any of the following acts and fails to correct the same within thirty (30) days after delivery of notice of default to the Franchisee:

(1)    The Franchisee or the Franchised Business is declared bankrupt or judicially determined to be insolvent, or all or a substantial part of the assets thereof are assigned to or for the benefit of any creditor, or the Franchisee admits its inability to pay his debts as they become due;

(2)    The Franchisee makes an unauthorized assignment or transfer of this Agreement, the Franchised Business or the franchise;

(3)    The Franchisee engages in conduct which reflects materially and unfavorably upon the operation and reputation of the Franchised Business, the System or the Company;

(4)    The Franchisee fails to comply with any federal, state or local law or regulation applicable to the operation of the Franchised Business;

(5)    The Franchisee fails to pay any fees or other amounts due the Company, any affiliate of the Company, or supplier to the Franchised Business;

(6)    The Franchisee defaults or fails to comply with one or more other requirements of this Agreement;

(7)    The Franchisee loses any license with respect to the operation of the Franchised Business; or

(8)    The Franchisee loses the right to occupy the Premises and the Franchisee fails to relocate the Franchised Business to a location and within a period of time approved by the Company following the expiration or termination of the lease for the Franchised Location.

C.    Alteration of Cure Periods.  The foregoing notwithstanding, to the extent that the provisions of this Agreement provide for periods of notice less than those required by applicable law, or provide for termination, cancellation, nonrenewal and the like other than in accordance with applicable law, such provision shall, to the extent such or not in accordance with applicable law, be superceded by said law, and the Company shall comply with applicable law in connection with each of these matters.

35

DCS – FA
11/15/04

D.    Cross Default.  Any default by the Franchisee of any other agreement between the Company and the Franchisee shall be deemed a default under this Agreement and any default by the Franchisee of this Agreement shall be deemed a default under any and all other agreements between the Company and the Franchisee.

17.3    The Franchisee's Rights to Terminate.

A.    Grounds.  If the Franchisee is in substantial compliance with this Agreement and the Company breaches any material provision, term or condition, the Franchisee may terminate this Agreement as provided herein.

B.    Procedure.  The Franchisee shall not have any right to terminate this Agreement or commence an action against the Company for injunctive relief, violation of any state, federal or common law, unless and until:

(1)    written notice setting forth the alleged breach in detail has been delivered to the Company by the Franchisee; and

(2)    the Company fails to correct, or diligently make all reasonable efforts to correct, the alleged breach within thirty (30) days after receipt of such written notice.

### ARTICLE XVIII.
### POST RELATIONSHIP OBLIGATIONS

18.1    Obligations.  In the event of termination, expiration or assignment of this Agreement by Franchisee, whether by reason of default, lapse of time or other cause, the Franchisee shall:  (A) promptly pay all amounts owed to the Company; (B) promptly return to the Company the manuals and other confidential materials; (C) maintain confidentiality of all proprietary information furnished by the Company; (D) immediately cease using any of the Marks; (E) immediately make all alterations to the building facilities and exterior signs at the Franchised Location to distinguish them from the appearance and identity of a Franchised Business, unless the purchaser will be operating the Franchised Business from the Franchised Location in the event of a permitted assignment of this Agreement(if the Franchisee shall fail or refuse to make or cause such changes to be made, the Company, without prejudice to its other rights and remedies, may enter upon the Premises, forcibly if necessary, without being guilty of trespass or any other tort, and make such changes at the Franchisee's expense); (F) at the Company's option, in the event of termination or expiration, sell to the Company, at the Franchisee's cost less ten percent (10%) for each year after acquisition, exterior signs, and permit the Company to remove said signage from the Franchised Location; (G) cancel all telephone listings, numbers, domain names, and directory advertising, and direct the transfer of the same to the Company or on its order, unless the purchaser will be acquiring such items in the event of a permitted assignment of this Agreement; and (H) pay all legal costs, including attorney's fees, incurred by the Company in the event of a termination of this Agreement.

36

DCS – FA
11/15/04

18.2  Survival of Obligations.  The expiration, termination or assignment of this Agreement shall be without prejudice to any of the rights and remedies of the Company. All obligations of the Company and the Franchisee which expressly or by their nature survive the expiration, termination or assignment of this Agreement shall continue in full force and effect subsequent and notwithstanding the expiration, termination or assignment of this Agreement, until they are satisfied in full or by their nature expire.

## ARTICLE XIX.
## NON-COMPETITION COVENANTS

19.1  In-Term Covenant.  The Franchisee (and the personal guarantors) will not, during the Term, or during the term of any Successor Agreement, without the Company's prior written consent, on its own account, or as an employee, consultant, partner, officer, director, or shareholder or owner, or in any other capacity of any other person, firm, entity, partnership or corporation, own, operate, lease, franchise, conduct, engage in, be connected with, having any interest in, or assist any person or entity engaged in any other business, that is engaged in the provision of dry cleaning services.

19.2  After Termination.  The Franchisee (and the personal guarantors) will not, for a period of two (2) years after the expiration, termination or assignment of this Agreement by Franchisee, on its own account or as an employee, consultant, partner, officer, director or shareholder or owner, or in any other capacity of any other person, firm, entity, partnership or corporation, own, operate, lease, franchise, conduct, engage in, be connected with, have any interest in or assist any person or entity engaged in any business providing dry cleaning or laundering services then located within the Protected Area, within five (5) miles of the Protected Area or within a radius of five (5) miles of any other Dry Cleaning Station$^®$ store in existence at the time of expiration, termination or assignment of this Agreement by Franchisee.

19.3  Scope.  The covenants in this Article XIX shall not be applicable to any Franchised Business operated by the Franchisee under another Franchise Agreement between the Company and the Franchisee.

19.4  Remedies.  The Franchisee acknowledges and agrees that any violation of the confidentiality or noncompetition covenants contained in this Agreement will result in immediate and irreparable injury to the Company for which no adequate remedy at law will be available.  Therefore, the Franchisee hereby consents to the Company obtaining an injunction prohibiting any conduct by the Franchisee in violation of the confidentiality or noncompetition covenants contained herein.  The Franchisee shall pay any and all costs and attorneys' fees in connection with enforcement of any of the provisions of this Section 19.4.  The Franchisee also acknowledges and agrees that if Franchisee should violate the provisions of Section 19.2, then the two (2) year period provided in Section 19.2 shall continue until two (2) years after such violation has ceased.  The Company's right to obtain injunctive relief or other equity relief shall be in addition to any other rights of the Company and shall in no way limit or prohibit the Company from obtaining money damages.

37

DCS – FA
11/15/04

## ARTICLE XX.
## ENFORCEMENT

20.1    Injunctive Relief.  The Company will be entitled, upon posting a bond to be determined by a court, but not to exceed One Thousand Dollars ($1,000) to the entry of temporary restraining orders and temporary and permanent injunctions enforcing the provisions of this Agreement, and any of our specifications, standards or operating procedures, or any of Franchisee's other obligations to the Company.  If the Company is successful in obtaining an injunction, or any other judicial relief or order from an arbitrator against the Franchisee, or in successfully defending any claim the Franchisee has brought against the Company, the Franchisee will pay the Company an amount equal to all of the Company's costs of prosecuting and/or defending the action, including reasonable attorneys' fees, costs of investigation, court and arbitration costs, and other litigation or arbitration expenses.  The Company's right to obtain injunctive relief or other equitable relief is in addition to any other right it may have under this Agreement and will in no way limit or prohibit the Company from obtaining money damages from the Franchisee if it breaches this Agreement.

20.2    Dispute Resolution.

A.      Mediation.  Except to the extent the Company believes it is necessary to seek equitable relief as permitted in Section 20.1, or to recover royalties or other amounts owed to it by the Franchisee, the Company and the Franchisee each agree to enter into mediation of all disputes involving this Agreement or any other aspect of the relationship, for a minimum of four (4) hours, prior to initiating any legal action against the other.

(1)     Upon written notice by a party to the other of its desire to mediate, the party receiving the notice will select an independent entity that provides mediation services to serve as mediator in the proceeding.  If the party receiving the notice of intent to mediate does not name such an organization within ten (10) days from the date the notice of intent to mediate is received, then the other party may proceed as if this Section 20.2 did not exist or, at its option, make the selection of the organization to provide mediation services. If either party selects an organization that is unwilling to serve as mediator, then the other party may select the organization.  Once the organization is designated and agrees to accept the appointment as mediator, the organization will be directed to schedule a mediation proceeding at a time mutually convenient to all parties.

(2)     The mediation will be held within forty-five (45) days following receipt by the mediation organization of notification that its services are requested. If the parties cannot agree on a date for mediation, then the mediation organization will select a date it believes is reasonable for both parties, given all the claimed conflicts and dates.

(3)     The person actually mediating the dispute will be required to have at least ten (10) years of experience as either a franchisee or franchisor (or as an officer of such an entity) or in franchise law.

38

DCS – FA
11/15/04

(4)    The Company and the Franchisee will equally share the cost of the mediator.

(5)    The mediator will select the location for the mediation, but unless both the Company and the Franchisee agree otherwise, the mediation will be held in a metropolitan area with at least two hundred fifty thousand (250,000) persons that is not located within one hundred (100) miles of either the Company's or the Franchisee's principal office.

(6)    Except for matters where the parties hereto are permitted to bring an action without first mediating the dispute, if either party initiates litigation or arbitration without complying with their obligation to mediate in accordance with this Section (unless the other party has failed to respond on a timely basis or has indicated it will not engage in mediation in accordance with the provisions of this Section), then upon petition of whichever party has a lawsuit or arbitration proceeding brought against it, the court or arbitrators will dismiss the litigation or arbitration without prejudice, and award attorneys' fees and costs to the party seeking dismissal in an amount equal to the attorneys' fees and costs the party seeking dismissal incurred.  If the court or arbitrator refuses for any reason to dismiss the action, then regardless of the outcome of the action, or of any award given In the action, the party initiating the arbitration or litigation will be responsible for all attorneys' fees and costs incurred throughout the arbitration or litigation by the other party as damages for failing to comply with the provisions of this Section 20.2.

B    Arbitration.  Except insofar as the Company elects to enforce this Agreement by judicial process as provided in Section 20.1, all controversies, disputes or claims arising between Company and Franchisee (including any claim against the Company's officers, directors, agents and employees, in their capacity as such, or against the owners and guarantors of Franchisee, if applicable) in connection with, arising from, or with respect to: (1) any provision of this Agreement or any other agreement related to this Agreement between the parties; (2) the relationship of the parties hereto; (3) the validity of this Agreement or any other agreement related to this Agreement between the parties, or any provision thereof; or (4) any specification, standard or operating procedure relating to the establishment or operation of the Franchised Business (except controversies, disputes or claims relating to the Marks or any lease or sublease of real estate), shall be submitted for arbitration at the Company's principal offices on demand of either party.

(1)    It is the parties' intention that state laws attempting to void out-of-state forum selection clauses for arbitration be pre-empted by the Federal Arbitration Act and that arbitration be held in the place designated above.

(2)    The arbitration will be held in accordance with the United States Arbitration Act (9 U.S.C. § 1 et seq.), and the rules of the American Arbitration Association (relating to the arbitration of disputes arising under franchise agreements, if any; otherwise, the general rules of commercial arbitration).

DCS – FA
11/15/04

(3)    The arbitrator appointed must have at least ten (10) years' experience in franchising or franchise law, and the arbitrator will be instructed that he or she must follow the substantive law and the other requirements, waivers and limitations of this Agreement.

(4)    The arbitrator shall have no authority to add, delete or modify in any manner the terms and provisions of this Agreement.  All findings, judgments, decisions and awards of the arbitrator will be limited to the dispute or controversy set forth in the written demand for arbitration and response to that demand.  The arbitrator will have the right to award or include in any award the specific performance of this Agreement, but will be required to file a reasoned brief with his or her award.

(5)    The Company and the Franchisee acknowledge that judgment upon an arbitration award may be entered in any court of competent jurisdiction and will be final, binding and non-appealable, except for mistakes of law, as permitted under the United States Arbitration Act or for failure of the arbitrator to meet the requirements of this Section 20.2.B.

(6)    Unless this Agreement is terminated in accordance with the provisions of Article XVII, during the pendency of any arbitration proceeding, the Company and the Franchisee will fully perform the requirements of this Agreement.

(7)    The Franchisee and Company agree that arbitration shall be conducted on an individual, not a class-wide, basis.

(8)    If, after either party institutes an arbitration proceeding, one or the other asserts a claim, counterclaim or defense, the subject matter of which, under statute or current judicial decision, is not arbitrable for public policy reasons, the party against whom the claim, counterclaim or defense is asserted may elect to proceed with the arbitration of all arbitrable claims, counterclaims or defenses or proceed to litigate all claims, counterclaims or defenses in a court having competent jurisdiction.

## ARTICLE XXI.
## MISCELLANEOUS

21.1    Severability.  It is the desire and intent of the parties hereunder that the provisions of this Agreement be enforced to the fullest extent possible under the applicable laws and policies.  Therefore, if any provision of this Agreement is determined by a court or arbitrator to be invalid or unenforceable, this Agreement shall be interpreted and enforced as if the completely invalid and unenforceable provision was not contained herein and partially valid and enforceable shall be enforced to the extent valid and enforceable.  If any applicable and binding law or rule of any jurisdiction requires a greater prior notice of the termination or refusal to extend the Term of this Agreement or prior notice of the refusal to grant the right to obtain a Successor Agreement than is required

40

DCS – FA
11/15/04

herein or the taking of some other action not required hereunder or if any applicable and binding law or rule of any jurisdiction, any provision of this Agreement or any specification, standard or operating procedure prescribed by the Company is invalid or unenforceable, the prior notice or other action required by such law or rule shall be substituted for the notice requirements hereof, or such invalid or unenforceable provision, specification, standard or operating procedure shall be modified to the extent required to be valid and enforceable. Such modifications to this Agreement shall be effective only in such jurisdictions and shall be enforced as originally made and entered into all other jurisdictions.

21.2    No Third Party Rights.   Anything to the contrary herein notwithstanding, nothing in this Agreement is intended, nor shall it be deemed to confer upon any person or legal entity and rights or remedies other than by reason of this Agreement other than the Company and the Franchisee and such of their respective successors and permitted assigns as may be contemplated by this Agreement.

21.3    Captions.   All captions herein are intended solely for the convenience of the parties, and none shall be deemed to effect the meaning or construction of any provision hereof.

21.4    Counterparts.   This Agreement may be executed in one or more counterparts and each copy so executed shall be deemed an original but all copies together shall constitute one agreement.

21.5    Governing Law.   This Agreement shall be interpreted and construed in accordance with, and any dispute between the parties governed by, the laws of the State of Nebraska, which laws shall prevail in any event of conflict of law, except to the extent governed by the United States Trademark Act of 1946 (Lanham Act, 15 U.S.C. 1051 et seq.), as amended, the United States Arbitration Act (9 U.S.C. 1 et seq.), or other federal law.   Notwithstanding the above, the parties agree, however, that if the Franchised Business is not located in Nebraska, and the Franchisee's principal office is not located in Nebraska, the provisions of the Nebraska Franchise Practices Act and any regulations promulgated thereunder will not apply.

21.6    Choice of Forum.    The Company and the Franchisee (including any guarantors of the obligations of the Franchisee) agree that any action brought by one of them against the other (which is not to be arbitrated pursuant hereto) shall be instituted in a state or federal court having subject matter jurisdiction thereof located in Nuckolls County, Nebraska and they irrevocably consent to personal jurisdiction and venue in such court and waive any objection they may have to the jurisdiction or the venue of such court (except to the extent jurisdiction is pre-empted by the arbitration provisions of this Agreement). However, if the Company is permitted to seek injunctive relief under this Agreement, it may, at its option, bring that action in the county in which the Franchised Business is located.

41

21.7  <u>Punitive Damage/Jury Trial Waiver.</u>  THE COMPANY AND THE FRANCHISEE (AND THEIR RESPECTIVE OWNERS AND GUARANTORS, IF APPLICABLE) HEREBY WAIVE TO THE FULLEST EXTENT PERMITTED BY LAW, THEIR RIGHT TO OR CLAIM FOR ANY PUNITIVE OR EXEMPLARY DAMAGE AGAINST THE OTHER AND AGREE THAT IN THE EVENT OF A DISPUTE BETWEEN THEM EACH SHALL BE LIMITED TO THE RECOVERY OF ANY ACTUAL DAMAGES SUSTAINED. THE COMPANY AND THE FRANCHISEE IRREVOCABLY WAIVE THEIR RIGHT TO A TRIAL BY JURY.   These waivers apply to all causes of action that are or might be included in any action, including claims related to the enforcement and interpretation of this Agreement, allegations of state or federal statutory violations, fraud, misrepresentation or similar causes of action and it applies even if persons that are not a party to this Agreement are named as additional parties in the proceeding.

21.8   <u>Waiver of Collateral Estoppel.</u>  The parties agree that they should be able to settle, mediate, litigate, arbitrate, or compromise disputes in which they are involved with third parties, without having those disputes directly affect the contract or relationship between them.  The Company and the Franchisee therefore agree that a decision of an arbitrator or court of law to which one of them is not a party will not prevent the party that was a party to such action from making similar arguments, or taking similar positions, in any action between them. The Company and the Franchisee therefore waive the right to assert that principles of collateral estoppel prevent either of them from raising any claim or defense in an action between the Company and the Franchisee if either the Company or the Franchisee lost a similar claim or defense in another action.

21.9   <u>Waiver.</u>  The Company and the Franchisee may, by written instrument, unilaterally waive any obligation or restriction upon the other under this Agreement.  No acceptance by the Company of any payment by the Franchisee and no failure, refusal or neglect of the Company or the Franchisee to exercise any right under this Agreement or to insist upon full compliance by the other with its obligations hereunder, including, without limitation, any mandatory specification, standard or operating procedure, shall constitute a waiver of any provision of this Agreement; provided, however, that such failure, refusal or neglect to exercise any right under this Agreement or to insist upon full compliance by the other with its obligations under this Agreement or under state or federal law, or with any specification, standard or operating procedure, shall constitute a waiver of any default arising under this Agreement or under state or federal law and shall preclude exercise or enforcement of any right or remedy arising therefrom, unless written notice of such default is provided by the non-defaulting party within twenty-four (24) months after such right of default occurs (except that this twenty-four (24) month clause shall not apply to any default that arises in whole or part by the underreporting of Gross Revenues by the Franchisee).  No exercise or enforcement by the Company or the Franchisee of any right or remedy hereunder shall preclude the exercise or enforcement by the Company or the Franchisee of any other right or remedy hereunder or which the Company or the Franchisee is entitled by law to enforce.

42

21.10  <u>Withheld Amounts.</u>  The Franchisee shall not, on the grounds of alleged non-performance by the Company of any of its obligations, withhold payment of or any amounts due the Company.

21.11  <u>Notices</u>.  All notices required herein shall be in writing and shall be delivered by hand, or sent by prepaid United States certified or registered mail addressed to the Company or the Franchisee at their respective principal offices first above written or at such other address as the Company or the Franchisee may designate in writing, and shall be effective on the sooner of delivery or three (3) days after mailing.

21.12  <u>Binding Effect.</u>  This Agreement is binding upon the parties and their respective executors, administrators, heirs, and permitted assigns and successors in interest, and shall not be modified except by written agreement signed by both the Franchisee and the Company, except that the Company shall have the right to unilaterally change the manuals or any portion thereof from time to time.

21.13  <u>Complete Agreement.</u>  This Agreement contains the complete expression of the agreement between the parties with respect to the subject matter hereof and there are no promises, representations or inducements except as herein provided.

21.14  <u>Consent</u>.  Whenever the Company's consent or approval is required in this Agreement, unless the provision specifically indicates otherwise, the Company has the right to withhold its approval or consent in its discretion, for any reason, or for no reason.

21.15  <u>Exercise of Rights</u>.  If the Franchisee or the Company elect to exercise any right or remedy allowed it under this Agreement or under the law, the exercise or enforcement of that right or remedy will not preclude either the Franchisee or the Company from exercising or enforcing any other right or remedy either the Franchisee or the Company may be entitled under this Agreement or by law to enforce.

21.16  <u>Uniformity</u>.  Because complete and detailed uniformity under many varying conditions may not be possible or practical, the Company specifically reserves the right and privilege, at its sole and absolute discretion, and as it may believe is in the best interests of all concerned in any specific instance, to vary standards for any franchisee based upon the peculiarities of a particular site or circumstance, business potential, existing business practices or any other condition the Company believes is important to the successful operation of each franchisee's business. The Franchisee will not complain on account of any variation from standard specifications and practices the Company grants to any other franchisee and the Franchisee may not require the Company to grant a like or similar variation to it.

21.17  <u>Joint and Several Liability</u>.  Each and every obligation  hereunder shall be joint and several in each and every respect in the event more than one person or entity signs this Agreement as the "Franchisee".

DCS – FA
11/15/04

IN WITNESS HEREOF, the Company and the Franchisee have respectively signed and sealed this Agreement as of the day and year first above written.

THE COMPANY DISCLAIMS ANY WARRANTY OR REPRESENTATION AS TO THE POTENTIAL SUCCESS OF THE FRANCHISEE'S BUSINESS OPERATIONS UNDER THIS AGREEMENT.

FRANCHISEE:
CARLA AND TIM BROSNAN

By _____
　　　CARLA BROSNAN

By _____
　　　TIM BROSNAN

COMPANY:
DRY CLEANING STATION, INC.

By _____
Its _____

**44**

DCS – FA
11/15/04

## PERSONAL GUARANTY AND ASSUMPTION OF FRANCHISEE'S OBLIGATIONS

In consideration of, and as an inducement to, the execution of the above Franchise Agreement (the "Agreement") by DRY CLEANING STATION, INC., each of the undersigned hereby personally and unconditionally: (1) guarantees to DRY CLEANING STATION, INC., and its successors and assigns, for the term of the Agreement and thereafter as provided in the Agreement, that the franchisee named therein ("Franchisee") shall punctually pay and perform each and every undertaking, agreement and covenant set forth in the Agreement; and (2) agrees to be personally bound by, and personally liable for the breach of, each and every provision in the Agreement as if the undersigned had individually been named as the Franchisee in the Agreement and had individually executed the Agreement.

Each of the undersigned waives:

(1)    acceptance and notice of acceptance by Dry Cleaning Station, Inc. of the foregoing undertakings;

(2)    notice of demand for payment of any indebtedness or nonperformance of any obligations hereby guaranteed;

(3)    protest and notice of default to any party with respect to the indebtedness or nonperformance of any obligation hereby guaranteed;

(4)    any right he may have to require that an action be brought against Franchisee or any other person as a condition of liability; and

(5)    any and all other notices and legal or equitable defenses to which he may be entitled.

Each of the undersigned consents and agrees that:

(1)    his direct and immediate liability under this guaranty shall be joint and several;

(2)    he shall render any payment or performance required under the Agreement upon demand if Franchisee fails or refuses punctually to do so;

(3)    such liability shall not be contingent or conditioned upon pursuit by Dry Cleaning Station, Inc. of any remedies against Franchisee or any other person;

(4)    such liability shall not be diminished, relieved or otherwise affected by any extension of time, credit or other indulgence which Dry Cleaning Station, Inc may from time to time grant to Franchisee or to any other person, including without limitation the

45

DCS – FA
11/15/04

acceptance of any partial payment or performance, or the compromise or release of any claims, none of which shall in any way modify or amend this guaranty, which shall be continuing and irrevocable during the term of the Agreement.

IN WITNESS WHEREOF, each of the undersigned has hereunto affixed his signature on the same day and year as the Agreement was executed.

WITNESS                                    GUARANTOR(S)

_____                    _____

46

## AMENDMENT TO THE FRANCHISE AGREEMENT DATED AUGUST 8, 2005 BY AND BETWEEN DRY CLEANING STATION, INC. AND TIM AND CARLA BROSNAN

This amendment made the 8th day of August, 2005 by and between Dry Cleaning Station, Inc. ("Company") and Tim and Carla Brosnan ("Franchisee").

### WITNESSETH:

WHEREAS, Company and Franchisee entered into a Franchise Agreement ("Franchise Agreement") dated August 8th, 2005;

WHEREAS, Franchise desires to make certain amendments to the Franchise Agreement;

WHEREAS, Company has consented to make certain amendments as requested by Franchisee;

NOW, THEREFORE, Company and Franchisee mutually agree to amend the Franchise Agreement as described within this Amendment as follows:

– In Paragraph 5.2C, insert the word "substantially "after the word "has" in the first line.

– Insert the word "substantially" as the first word of the sentence in 5.2D.

– Paragraph 7.2A. In the last full paragraph, eliminate the first sentence.

– As the opening words of paragraph 7.10, insert the words "Upon reasonable notice."

– Paragraph 8.6. In the last line before the word "required", insert the term "reasonably." In the next paragraph, replace the words "sole and absolute" with the term "reasonable."

– Paragraph 8.11, remove the last sentence.

– In Paragraph 11.2B, change the words "sole and absolute" to the term "reasonable".

– Remove Paragraph 14.1A, and insert "On or before the 10th of each month a report of the Gross Revenues of the previous month and such other data information and such supporting records as the Company may require;"

– Paragraph 15.2B. Eliminate the words "less than one-half".

– Eliminate Paragraph 15.2B4.

– In Paragraph 15.2C3 add the word "uncontested" before the word "obligations." Also, eliminate subsections 5 and 9.

– Eliminate Paragraph 17.1

- In Paragraph 17.2A. The California Franchise Relations Act provides strict limitation on "no cure" breaches.

- In Paragraph 17B6. Insert the word "material" prior to the word "requirements."

- In Paragraph 18.1A, insert the word "uncontested" before the word "amounts." Eliminate subparts G and H.

- Please eliminate Paragraph 19.4.

- Please eliminate Paragraph 20.1.

- Paragraph 20.2B. The California Franchise Relations Act provides strict limitations on this paragraph.

- Paragraph 21.5, The California Franchise Relations Act provides strict limitations on this paragraph.

- Eliminate Paragraphs 21.7 and 21.8.

Except as herein provided, all other provisions and exhibits of the Franchise Agreement shall remain in full force and effect and shall be binding upon the parties, their heirs, assigns, successors, and personal representatives.

This Amendment is agreed to and accepted this 8th day of August, 2005.

"Franchisee"
TIM & CARLA BROSNAN

By: _____
Tim Brosnan

By: _____
Carla Brosnan

"Company"
DRY CLEANING STATION, INC.

By: _____

Its: _____

# EXHIBIT B

## TERRITORIAL DEVELOPMENT AGREEMENT

THIS AGREEMENT is made and entered into this 8th day of August, 2005 by and between DRY CLEANING STATION, INC., a Nebraska corporation with its principal office at 8301 Golden Valley Road, Suite 240, Minneapolis, Minnesota 55427 (the "Company"), and Carla and Tim Brosnan, with its principal office at 1558 Ralston Avenue, Burlingame, CA   94010 ("Developer").

### RECITALS

WHEREAS, the Company has developed and attained knowledge in the operation of stores providing dry cleaning and laundering services to the general public under the trade name and service mark "DRY CLEANING STATION[®]", and other or substitute trade names and marks or associated logos;

WHEREAS, the Company has developed certain formats, systems, methods and procedures for establishing and operating low price dry cleaning stores (collectively, the System);

WHEREAS, Developer understands the importance of establishing a uniform marketing system for stores selling the products and services authorized to be sold by the Company from the stores, and desires to use the trade name and service mark "Dry Cleaning Station[®]," and any other marks hereafter developed by the Company for use with the System (the Marks) in the operation of the stores, and to enjoy the benefits of the System; and

WHEREAS, Developer has made application to the Company for the right to enter into Franchise Agreements pursuant to this Agreement, and the application has been approved by the Company.

NOW, THEREFORE, in consideration of the mutual promises and covenants set forth in this Agreement and for other good and valuable consideration, the parties hereby agree as follows:

1.    In order to induce the Company to enter into this Agreement, and as consideration therefore, Developer has paid the Company a nonrefundable development fee of $100,000.00 (the "Fee""") for the right to open Twenty (20) Dry Cleaning Station[®] stores (the "Total Store Number") within the Franchised Area (as defined in Paragraph 2 below) beyond the Developer's existing initial Dry Cleaning Station[®] franchised store(s).

2.    This Agreement shall be for the term set forth on Exhibit 1, commencing on the date this Agreement is executed by both the Company and Developer.  This Agreement shall not be considered executed and shall not be enforceable until it has been signed by both the Company and Developer.  There are no rights of renewal under this Agreement.  At the end of the term of this Agreement, the Company shall have the right to re-evaluate the prospects for the establishment of Dry Cleaning Station[®] stores in the Territory (as defined below), and the Company may determine

1

DCS - TDA
11/15/04

*Exhibit B*

that the Territory shall be further developed by opening additional Dry Cleaning Station® stores in the Territory, either by the Company, by the Company's affiliates or by other third parties.

3.    The Company grants Developer, for the term of this Agreement, the right to enter into Franchise Agreements to open and operate within the area described on Exhibit 1 (the "Territory"), the number of Dry Cleaning Station® stores equal to the Total Store Number. The rights and privileges granted to the Developer in this Agreement are expressly limited to the Territory and are expressly subject to the terms and conditions of this Agreement.

4.    The Company shall not franchise, subfranchise, develop, or own any Dry Cleaning Station® stores in the Territory while this Agreement is in effect without the consent of the Developer. However, the foregoing sentence shall be excised from this Paragraph and shall have no force or effect if Exhibit 1 does not specifically provide that the Territory is "protected". If the first sentence of this Paragraph is excised, Developer shall have none of the rights set forth in such sentence and the Company shall have the right to franchise, subfranchise and own Dry Cleaning Station® stores in the Territory. Notwithstanding the first sentence of this Paragraph, the Company or an affiliate thereof shall have the right to use, develop, or license rights which are the subject of this Agreement (i) for any purpose outside the Territory, and (ii) for other business purposes outside the scope of this Agreement, without the use of the Marks, either inside or outside the Territory. Further, nothing set forth herein shall limit the right of the Company to market or service, or to appoint its franchisees or affiliates to market or service National Accounts (as defined below) if such Accounts have locations in the Territory. For purposes of this Agreement, National Accounts are defined as accounts having multiple locations, at least one of which is located outside the Territory.

5.    Developer shall not be entitled to franchise, subfranchise, license, or sublicense other persons or entities under this Agreement, and Developer may develop, own, and operate Dry Cleaning Station® stores under this Agreement only in the Territory. The rights, privileges and franchise granted and conveyed to Developer in this Agreement shall be exclusively for the Territory and may not be assigned, sold, or transferred by Developer.

6.    If a real estate site is to be acquired for a Dry Cleaning Station® store to be opened under this Agreement, Developer agrees to comply with standardized site selection criteria, if any, and other conditions established by Company. Developer will submit to the Company for its acceptance, each site proposed by Developer for a store in the Territory. Any site accepted by the Company will be automatically canceled and withdrawn, one hundred eighty (180) days after the date such site is accepted by the Company (which may be extended in writing at the sole discretion of the Company) unless within the one hundred eighty (180) day period Developer: (a) acquires such site by purchase or by lease; and (b) constructs a Dry Cleaning Station® store in accordance with the terms of the Franchise Agreement entered into for such store.

7.    Developer agrees to execute the Company's then current form of standard Franchise Agreement and to be bound by all its terms for each Dry Cleaning Station® store it opens in the Territory pursuant to this Agreement and the owners of the Developer, if the Developer is an entity, must personally guaranty each Franchise Agreement. Upon execution of a Franchise Agreement, the Developer shall pay the initial franchise fee for the Dry Cleaning Station® store to be opened,

2

less Five Thousand Dollars ($5,000). However, the initial franchise fee for the Developer's second and any subsequent Dry Cleaning Station® store opened within the Territory pursuant to this Agreement will be Fifteen Thousand Dollars ($15,000). Developer acknowledges that the standard Franchise Agreement may be modified from time to time by the Company and that reasonable modifications and amendments to that Agreement shall not alter Developer's obligations under this Agreement.

       8.     If Developer has only one full services or drop station Dry Cleaning Station® store open and operating in the Territory pursuant to this Agreement, Developer will pay the royalty rate set forth in the applicable Franchise Agreement for such store. However, at such time as Developer has more than one full service or drop station Dry Cleaning Station® store open and operating in the Territory pursuant to this Agreement, and so long as Developer is in compliance with the terms of this Agreement and each Franchise Agreement, the monthly royalty fee will be four percent (4%) of such stores' initial Forty Two Thousand Dollars ($42,000) in monthly gross revenues, three percent (3%) of the next Forty Two Thousand Dollars ($42,000), and two percent (2%) of all monthly gross revenues over Eighty Four Thousand Dollars ($84,000) for all full service and drop station Dry Cleaning Station® stores opened in the Territory pursuant to this Agreement. Any Dry Cleaning Station® store not opened pursuant to this Agreement, which is beyond the Total Store Number must pay the monthly royalty fee set forth in the Franchise Agreement for such store.

       For purposes of this Agreement a full service store is a retail store that has a dry cleaning and shirt processing plant on site. A drop station store is a retail store that has no dry cleaning or shirt processing plant on site, but that has direct access to a full service store in the Dry Cleaning Station® system. A plant store cannot be used to satisfy the requirement that Developer have more than one store open and operating to qualify for the reduced royalty rates set forth in this Paragraph 8. A plant store is a store that does not provide retail services but has a shirt processing plant on site allowing the Developer to process and launder garments for other retail Dry Cleaning Station® stores and other retailers.

       9.     Developer acknowledges and agrees that a material provision of this Agreement is that Developer comply with the development schedule set forth below (the "Development Schedule") and that time is of the essence in complying with the Development Schedule. Developer agrees that this Agreement and all of Developer's rights hereunder may be terminated by the Company in its sole discretion in the event Developer does not comply with the Development Schedule. Developer therefore agrees to have the following number of Dry Cleaning Station® stores opened and continuously operating under Franchise Agreements in the Territory during the term of this Agreement in accordance with the Development Schedule set forth below:

<div align="center">3</div>

DCS - TDA
11/15/04

| MINIMUM CUMULATIVE NUMBER OF STORES OPENED AND CONTINUOUSLY OPERATING | | MUST BE OPEN AND CONTINUOUSLY OPERATING IN THE TERRITORY BY |
|---|---|---|
| Two | (2) | August 31, 2006 |
| Four | (4) | August 31, 2007 |
| Six | (6) | August 31, 2008 |
| Eight | (8) | August 31, 2009 |
| Ten | (10) | August 31, 2010 |
| Twelve | (12) | August 31, 2011 |
| Fourteen | (14) | August 31, 2012 |
| Sixteen | (16) | August 31, 2013 |
| Eighteen | (18) | August 31, 2014 |
| Twenty | (20) | August 31, 2015 |

With respect to each store set forth in the Development Schedule, Developer further agrees to have executed a Franchise Agreement and paid the initial franchise fee for each store, at least one hundred eighty (180) days before the date set forth above for the opening of the store, regardless of whether Developer has obtained a site for such store.

(a)     The expiration or termination of this Agreement by the Company shall not affect any Dry Cleaning Station® store then operated or under construction by Developer for which a Franchise Agreement has been executed by the parties hereto; and all of the parties' rights and obligations under each such Franchise Agreement(s) shall remain in full force and effect unless and until expiration or termination pursuant to its or their own terms. Further, the reduced royalty rate set forth in Paragraph 8 of this Agreement shall continue to apply to the Developer's Dry Cleaning Station® stores open and operating in the Territory pursuant to this Agreement until such time as there is only one such store open and operating.

(b)     Developer represents that it has conducted its own independent investigation and analysis of the prospects for the establishment of Dry Cleaning Station® stores within the Territory, approves of the Development Schedule as being reasonable and viable, and recognizes that failure to achieve any of the results described in the Development Schedule constitutes a material breach of this Agreement. If Developer fails to comply with the Development Schedule, the Company shall have the right to terminate this Agreement as provided herein.   Upon termination, all rights granted to Developer under this Agreement shall forthwith revert to the Company, except for those obligations that continue beyond termination of this Agreement.

10.     Developer agrees to and shall, at its expense, comply with all federal, state, city, municipal, and local laws, ordinances, rules, and regulations in the Territory pertaining to the operation of its business, including all laws relating to employees. Developer shall, at its expense be

**4**

absolutely and exclusively responsible for obtaining and qualifying for all licenses and permits required by law for Developer's business.

11.     In addition to the other rights of termination contained in this Agreement, the Company shall have the right to terminate this Agreement effective immediately upon receipt by Developer of notice of default, if Developer:

(a)     fails to meet any of the terms or conditions set forth in Paragraph 9, including failure to meet the Development Schedule set forth therein;

(b)     files or has filed against it a petition under any bankruptcy, insolvency or similar law; without Developer's causing same to be dismissed within one hundred twenty (120) days of such filing;

(c)     transfers or attempts to transfer this Agreement in violation of Paragraph 13 hereof;

(d)     voluntarily abandons the franchise relationship;

(e)     is convicted in a court of competent jurisdiction of an offense directly related to the business conducted pursuant to this Agreement or is otherwise convicted of a felony;

(f)     fails to cure a default under this Agreement or under a Franchise Agreement with the Company which materially impairs the goodwill associated with the Marks after Developer received written notice to cure at least twenty-four (24) hours in advance of the notice of termination;

(g)     Makes an assignment for the benefit of creditors, or admits its inability to pay its obligations as they become due;

(h)     Commits repeated, material violations of any health, safety, or other regulatory law, ordinance or regulation or operates any Dry Cleaning Station® store in a manner that presents a health or safety hazard to its employees, customers or the general public;

(i)     Submits to the Company, two (2) or more sales reports, financial statements, other information or supporting records in any period of twelve (12) consecutive months, which understate by two percent (2%) or more the gross revenues of any Dry Cleaning Station® store owned or operated by the Developer or materially distorts any other material information; or

(j)     Otherwise materially breaches this Agreement or any of its Franchise Agreements (whether or not such breaches are corrected after notice) or any specification, standard, or operating procedure prescribed by the Company and does not correct such failure within a reasonable time set forth in the notice to cure sent by the Company to Developer which shall in no event be required to be more than thirty (30) days.

5

The foregoing notwithstanding, to the extent that the provisions of this Agreement provide for periods of notice less than those required by applicable law, or provide for termination other than in accordance with applicable law, such provisions shall, to the extent such are not in accordance with applicable law, be superseded by said law, and Developer shall comply with applicable law in connection with each of these matters.

12.    If this Agreement is terminated or otherwise expires, Developer shall comply with all applicable provisions of this Agreement, including those provisions with obligations that continue beyond the termination of this Agreement. Upon expiration or termination of this Agreement, all rights granted to the Developer pursuant to this Agreement shall automatically revert to the Company and the Company shall have the right to develop the Territory or to contract with others for the future development of the Territory. Upon termination or expiration, Developer shall continue to abide by and comply with all terms of such Franchise Agreement(s).

13.    No Developer, partner (if Developer assigns this Agreement to a partnership or Developer is a partnership), shareholder (if Developer assigns this Agreement to a corporation or Developer is a corporation), or member (if Developer assigns this Agreement to a limited liability company or the Developer is a limited liability company) without the prior written consent of the Company, by operation of law or otherwise, shall sell, assign, transfer, convey, give away or encumber to any person, company or partnership or other legal entity, its interest in this Agreement or its interest in the franchise granted hereby, any interest in Developer's business hereunder or its interest in a proprietorship, partnership, limited liability company or corporation which owns any interest in Developer's business hereunder. Any purported assignment not having the necessary consent shall be null and void and shall constitute a material default hereunder.

(a)    In the event Developer is an individual, Developer may assign and transfer its rights hereunder to a corporation, limited liability company or partnership without, however, being relieved of any personal liability, provided:

(i)    The corporation, company or partnership is newly organized and its activities are confined exclusively to operating Developer's business hereunder;

(ii)    Developer is the owner of more than fifty percent (50%) of the equity interest of the entity and is the principal executive officer thereof;

(iii)    All money obligations of Developer to the Company are fully paid;

(iv)    The corporation, company or partnership agrees, in a writing satisfactory to the Company, to assume all Developer's obligations hereunder;

(v)    Each stock, membership or partnership certificate of the entity shall have conspicuously endorsed upon it a statement that it is held subject to, and that further assignment or transfer thereof is subject to, all restrictions imposed upon assignments by this Agreement; and

6

DCS - TDA
11/15/04

(vi)    No new shares of equity in the corporation or interests in the company or partnership, shall be issued to any person, partnership, trust, foundation, or corporation without obtaining the Company's prior written consent and then only upon disclosure of the terms and conditions contained herein being made to the prospective new holders of the equity or other interest.

(b)    The Company shall not unreasonably withhold its consent to any assignment of less than one-half (1/2) of the beneficial voting interest in the Developer or the Developer's business hereunder, provided such transfer is not part of a series of transfers intended to evade this provision, and further provided:

(i)    The transferee shall enter into a written agreement with the Company, in a form satisfactory to the Company, assuming and/or guaranteeing all of the Developer's obligations hereunder;

(ii)    Any defaults under this Agreement on the part of Developer have been remedied;

(iii)    Such other reasonable conditions as may be required by the Company in connection with a transfer have been satisfied; and

(iv)    Developer executes a general release of all claims (to the extent allowed by law) Developer may have against the Company, its directors, officers, shareholders and employees, in both their corporate and individual capacities.

(c)    If an assignment, alone or together with other previous, simultaneous, or proposed assignments, would have the effect of transferring one-half (1/2) or more of the beneficial or voting interest in Developer, or Developer's business operated hereunder, the Company will not unreasonably withhold its consent to the assignment if all the following conditions and requirements have been satisfied:

(i)    The transferee shall be of good moral character and reputation, shall have a good credit rating, financial capabilities, and shall have the aptitude, skills and qualifications in the Company's sole and absolute judgment, to conduct Developer's business and to fulfill the transferor's obligations to the Company.    Developer shall provide the Company with the information it may reasonably require to make a determination concerning the proposed transferee;

(ii)    Developer shall have fully paid and satisfied all Developer's obligations to the Company;

(iii)    Developer shall have executed a general release of all claims (to the extent allowed by law) Developer may have against the Company, its directors, officers, shareholders, and employees, in both their corporate and individual capacities;

(iv)    If Developer and/or Developer's owners finance any portion of the purchase price, such persons must execute a subordination agreement, in form reasonably required

7

DCS - TDA
11/15/04

by the Company, agreeing to subordinate the transferee's obligations to such persons to the obligations of the transferee to the Company; and

(v)     Developer shall provide the Company with such information as the Company shall require to make such evaluations of the proposed transferee as it shall deem necessary to satisfy its requirements.

14.     Developer shall indemnify and hold the Company, its stockholders, directors, officers, employees, agents and assignees harmless against any liability for claims arising out of activities of Developer that are not in accordance with this Agreement or any law, rule, regulation or custom governing Developer's business conducted pursuant to this Agreement. For purposes of this Paragraph 14 and Paragraph 15, "claims" means and includes, without limitation, all fines, suits, proceeding, investigation or inquiry (formal or informal) demands or actions of any kind or nature including taxes, instituted by any third party, arising or growing out of or otherwise connected with activities of Developer that are not in accordance with this Agreement or any law, rule, regulation or custom governing Developer's business, actual and consequential damages, and costs reasonably incurred in the defense of any claim against the Company such as accountants, attorneys and expert witness fees, costs of investigation and proof of facts, court costs, other litigation expenses and travel and living expenses. For purposes of this Paragraph, liability shall include without limitation reasonable attorneys' fees, costs of investigation or proof of facts, court costs, other litigation expenses and travel and living expenses, and all amounts paid or incurred by the Company arising out of a claim. The Company shall have the right to defend any such claim against it. Such an undertaking by the Company shall, in no manner or form, diminish Developer's obligation to indemnify the Company and to hold it harmless. The Company shall not be required or obligated to seek recovery from third parties or otherwise mitigate its losses in order to maintain a claim against Developer. If a decision rendered in an action or suit covered by this Paragraph is against Developer or the Company, and the Company desires to appeal the decision, Developer may notify the Company within ten (10) days of the date of the decision of its intent to abide by the decision, then, in such event, Developer shall pay the Company the amount required of it under this Paragraph, and all future costs related to the appeal and/or settlement of the claim shall be the responsibility of the Company.

15.     The Company agrees to indemnify Developer against and to reimburse Developer for any obligations or liability for damages payable to persons other than Developer or its owners, attributable to false representations, or warranties of the Company, or caused by the negligence or willful action of the Company, and for costs reasonably incurred by Developer in the defense of any such claim or any action arising there from in which it is named as party, provided that the Company shall have the right to participate in and to control any such litigation or proceeding.

16.     The indemnities and assumptions of liabilities and obligations set forth in this Agreement shall continue in full force and effect subsequent to, and notwithstanding the expiration, termination or assignment of, this Agreement.

8

DCS - TDA
11/15/04

17.     Nothing in this Agreement, express or implied, shall give Developer any rights in or to any of the Company's names, trade names, trademarks, service marks, logotypes, or commercial symbols.

18.     Any action taken by Developer pursuant to this Agreement is solely on Developer's own behalf, and under no circumstances shall Developer have any right or authority to bind the Company.

19.     Notwithstanding any previous oral or written statements, this Agreement, together with any duly executed Franchise Agreements, constitutes the entire agreement between the parties and may be amended only in writing signed by all parties hereto. No amendment, change or waiver of any of the terms of this Agreement shall be binding upon either party unless the same is in writing and signed by the Company and by Developer.

20.     Until such time as Developer has executed a Franchise Agreement for a Dry Cleaning Station® store to be opened in the Territory pursuant to this Agreement, the following provisions of the first Franchise Agreement Developer signed for the acquisition of a Dry Cleaning Station® store (the "First Agreement") will be a part of this Agreement (even if such other agreement is terminated in the future) and are hereby incorporated herein by reference: (i) (Dispute Resolution); (ii) (No Third Party Rights); (iii) (Governing Law); (iv) (Choice of Forum); (v) (Punitive Damage/Jury Trial Waiver); (vi) (Waiver of Collateral Estoppel); (vii) (Waiver); (viii) (Consent); (ix) (Exercise of Rights); (x) (Uniformity); and (xi) (Joint and several liability). At such time as the Developer has executed a Franchise Agreement to open a Dry Cleaning Station® store in the Territory pursuant to this Agreement, the provisions stated above of that Franchise Agreement shall apply to this Agreement in lieu of those of the First Agreement.

21.     This Agreement is binding upon the parties hereto, their respective heirs, permitted assigns, and successors in interest.

22.     Developer acknowledges that:

(a)     it has conducted an independent investigation of the prospects for the establishment of Dry Cleaning Station® stores within the Territory, and recognizes that the business venture contemplated by this Agreement involves business and economic risks and that its success will be primarily dependent upon the personal efforts of Developer.

(b)     Developer acknowledges that the Company does not warrant or guarantee that Developer will derive income from Developer's Dry Cleaning Station® store(s).

(c)     Developer acknowledges that the Company has recommended to Developer that Developer should retain legal counsel to review this Agreement and advise Developer as to the terms and conditions of this Agreement and the potential economic benefits and risks of loss relating to this Agreement.

(d)     Developer acknowledges that it received a copy of this Agreement at least five (5) business days prior to the date that this Agreement was executed by Developer.

DCS - TDA
11/15/04

9

Developer further acknowledges that it has received a Uniform Franchise Offering Circular at least ten (10) business days prior to the date this Agreement was executed by Developer.

23.    This Agreement may be executed in counterparts, each of which shall be deemed an original, but all of which shall constitute the same instrument.

24.    All notices required herein shall be in writing and shall be delivered by hand, or sent by prepaid United States certified or registered mail addressed to the Company or the Franchisee at their respective principal offices first above written or at such other address as the Company or Developer may designate in writing, and shall be effective on the sooner of delivery or three (3) days after mailing.

25.    This Agreement may be assigned or otherwise transferred by the Company without notice to Developer and, if so assigned or transferred, shall inure to the benefit of the Company's successors and assigns.

IN WITNESS WHEREOF, this Agreement has been executed by the Company and Developer the day first above written.

CARLA AND TIM BROSNAN                    DRY CLEANING STATION, INC.
[DEVELOPER]

By _____          By _____

Its _____          Its _____

10

## EXHIBIT 1

Territory: The following counties in the State of California:

Alameda, Santa Clara and San Mateo Counties in California

X Protected                                              _____ Unprotected

Term of Agreement: 10 Years to August 31, 2015

CARLA AND TIM BROSNAN
(Developer)

By _Carla Brosnan_
Carla Brosnan

By _Tim Brosnan_
Tim Brosnan

DRY CLEANING STATION, INC.

By _____

Its _____ CEO _____

11

**AMENDMENT TO THE TERRITORIAL DEVELOPMENT AGREEMENT DATED AUGUST 8TH, 2005 BY AND BETWEEN DRY CLEANING STATION, INC. AND TIM AND CARLA BROSNAN**

This amendment made the 8th day of August, 2005 by and between Dry Cleaning Station, Inc. ("Company") and Tim and Carla Brosnan ("Franchisee").

### WITNESSETH:

WHEREAS, Company and Franchisee entered into a Territorial Development Agreement ("Territorial Development Agreement") dated August 8th, 2005.

WHEREAS, Franchisee desires to make certain amendments to the Territorial Development Agreement;

WHREAS, Company has consented to make certain amendments as requested by Franchisee;

NOW, THEREFORE, Company and Franchisee mutually agree to amend the Territorial Development Agreement as described within this Amendment as follows:

− Paragraph 9 shall require Developer to sign a Franchise Agreement and pay the fee at the time of the store lease signing.

− Paragraph 11(a), insert the word "Substantially" before the word "fails".

− Eliminate Paragraph 11.f.

− Eliminate Paragraph 13(b)(iii).

− Eliminate Paragraph 13 ( c )(iii).

Except as herein provided, all other provisions and exhibits of the Territorial Development Agreement shall remain in full force and effect and shall be binding upon the parties, their heirs, assigns, successors, and personal representatives.

This Amendment is agreed to and accepted this 8th day of August, 2005.

"FRANCHISEE"
TIM & CARLA BROSNAN

By: _____
       Tim Brosnan

By: _____
       Carla Brosnan

"COMPANY"
DRY CLEANING STATION, INC.

By: _____

Its: _____